Argued April 4, 1978, affirmed June 19, 1979

# WELCH,
*Respondent/Cross-Appellant,*
*v.*

# U. S. BANCORP REALTY AND MORTGAGE TRUST,
*Appellant/Cross-Respondent*

(TC 421-202, SC 25087)
596 P2d 947

[673]

William M. McAllister, of Davies, Biggs, Strayer, Stoel and Boley, Portland, argued the cause for appellant/cross-respondent. With him on the briefs were Gregory R. Mowe and Charles F. Adams, of Davies, Biggs, Strayer, Stoel and Boley, and Wayne Hilliard, of Dezendorf, Spears, Lubersky and Campbell, Portland.

John R. Faust, Jr., of Hardy, McEwen, Weiss, Newmann and Faust, Portland, argued the cause for respondent/cross-appellant. With him on the brief was William Bradley Duncan, Forest Grove.

Before Denecke, Chief Justice, and Holman, Howell, Bryson,* Lent and Linde, Justices.

LENT, J.

---

* Bryson, J. retired April 1, 1979.

**LENT,J.**

This is an action for damages for breach of contract in which plaintiff[1] obtained verdict and judgment and defendant appeals. Plaintiff cross-appeals, asking for a new trial on the issue of damages alone. We affirm.

Trial of this case commenced on October 27, 1976, and culminated in jury verdict on November 26, 1976. Considering the length of the proceedings and that the transcript of testimony and proceedings runs to 2,619 pages, supplemented by at least 250 exhibits, we are impressed by the skill of counsel and the trial court, which has resulted in limiting this appeal to important questions in the resolution of this dispute. The assignments of error on appeal and cross-appeal go to the very heart of the issues of liability and damages, respectively, and both parties, in the main, forego raising trivial and inconsequential claims of error.

Defendant assigns as error the failure of the court to grant defendant's motion for a directed verdict. Defendant presents two main arguments that the trial court erred: (1) the evidence established that plaintiff had breached the contract and defendant was thereby excused from performance, and (2) the evidence was insufficient to submit to the jury plaintiff's claim for damages on the theory of lost profits. As to this assignment of error we are required to view the evidence in the light most favorable to the plaintiff and accept all conflicts in the evidence as having been resolved in plaintiff's favor. *Wootten v. Dillard,* 286 Or 129, 136, 592 P2d 1021 (1979). We cannot overturn the verdict unless we can affirmatively say there was no evidence to support it. Or. Const., Amend. Article VII, Section 3.

---

[1] There were actually two plaintiffs when the case was filed, but prior to trial the other plaintiff assigned all his interest to Welch, and all parties treat Welch as the plaintiff on this appeal as they did at trial.

## Background Facts[2]

In late 1972 Lloyd Corporation (Lloyd) owned a tract of vacant land of approximately 68.44 acres near Washington Square in Washington County. This land was zoned for industrial use and was offered for sale through a realtor named Bowman. Plaintiff was a developer, who had experience in dealing with Washington County on zoning matters. Plaintiff approached Bowman about purchasing the property in November, 1972.

Harry Mangan was, among other things, a vice-president of a corporation named "Bancorp Management Advisors" (BMA), which acted as adviser to defendant. Plaintiff approached Mangan concerning financing the purchase and development of the tract. Plaintiff proposed a development of a mix of high density residential units with retail and office commercial units. This was proposed to be done as a planned unit development (PUD).

Further negotiations among Mangan and other agents of the defendant, plaintiff, Bowman and Lloyd, resulted in five documents, introduced into evidence as Exhibits 1 through 5. Exhibit 1 was an earnest money agreement dated June 8, 1973, between Lloyd and plaintiff for sale of the tract for $1,192,000. This document provided in part:

> "This proposal is subject to the following additional conditions; [sic]
>
> "1. Closing of this sale is dependent upon purchaser's ability to obtain *rezoning of the subject property to a planned unit development.* In this connection, purchaser agrees to devote his best efforts to prepare a detailed presentation for submission to the Washington County Planning Commission no later than August 15, 1973. After the application is filed, purchaser agrees to use his best efforts to follow through the necessary procedures required by Washington County to process a rezoning application.

[2] We shall state as facts what we find could be established from evidence in the record.

In case the rezoning has not been accomplished by October 31, 1973, this contract terminates * * *

"2. On or before July 30, 1973, purchaser will supply evidence that the payment schedule listed herein will be guaranteed by the U. S. Bancorp REIT or other financial institution, provided the rezoning is accomplished. * * *

"* * * * *" (emphasis added)

Exhibit 2 is in the form of a letter dated June 25, 1973, from Bowman to plaintiff setting forth agreed modifications to the earnest money agreement. Written approval is endorsed upon the letter by plaintiff under date June 26, 1973, and by Lloyd under date June 27, 1973. The letter provides in part:

"* * * * *

"It is agreed that the Lloyd Corporation shall have the right to appoint a qualified land planner to review your development plan and rezoning proposal. If the Lloyd Corporation is not satisfied with your plan, its representative will make suggestions and will attempt to work out mutually acceptable modifications. The purpose of this is so that the Lloyd Corporation will feel that *the final plan will represent the highest and best use of the property, creating the highest potential land value.*

"* * * * *" (emphasis added)

Exhibit 3 is a letter dated January 28, 1974, addressed to Lloyd on the letterhead of plaintiff and signed by plaintiff. The letter proposed the reinstatement of the earnest money contract, which by its own terms had terminated on October 31, 1973, but offered certain changes in the earnest money contract:

"1. The new contract will be with U. S. BanTrust, who will become the purchaser rather than guarantor of the payment schedule. The BanTrust and I will work together to insure that a thoroughly professional job is done in planning, preparation and presentation of *the zone change* material.

"2. Within 60 days of your approval of this reinstatement, I will submit full information concerning *the zone change* to be requested to the U. S.

[677]

BanTrust and to the Lloyd Corporation for approval. If either U. S. BanTrust or the Lloyd Corporation requests changes in the application, I will make every reasonable effort to incorporate them on a mutually satisfactory basis. If agreement cannot be reached on any such changes within 30 days of submission, our contract will then terminate. If approval is received from both U. S. BanTrust and Lloyd Corporation, I will submit *the rezoning* application to Washington County within 10 days thereafter.

"3. The normal time required for final approval of *a rezoning proposal* is 90 days. It is necessary to secure not only the approval of Washington County, but also of CRAG (Columbia River Association of Governments) and the State of Oregon Department of Environmental Quality. If administrative delays beyond my control within any of these three governmental agencies prevent a final approval within 90 days after the application is filed, then the time allowed for completing *the rezoning* is to be extended to the next regularly scheduled meeting of each of the three organizations at which a decision could be made.

"If *rezoning* is not approved within 90 days from the date of application or within the extended period mentioned above, this contract will then terminate.

"4. After *rezoning* is approved, there is a 60-day period in which the county's decision can be challenged in court. Accordingly, closing of the sale is to be scheduled for the 61st day after *rezoning* provided there is no such challenge. If *the rezoning* is challenged, the time for closing is to be extended no longer than 75 days after the suit is filed. If the sale has not been closed within the 75 days, seller would have the option of terminating the contract.

"5. * * * *" (emphasis added)

Below the plaintiff's signature to the letter there were provided indicated spaces for approval by plaintiff, Lloyd and defendant. In the indicated spaces plaintiff signed approval on February 5, 1974, and Lloyd signed

[678]

approval on February 28, 1974. Defendant did not sign.

Exhibit 4 is a letter on defendant's letterhead dated April 15, 1974, addressed to Lloyd and signed by defendant. The text of that letter follows:

"We have reviewed the letter agreement dated January 28, 1974 between Messrs. Thomas K. Welch, Gordon Merrill and yourselves extending the term of the earnest money agreement of June 8, 1973. *The terms set forth in the agreement dated January 28, 1974 are satisfactory to us* subject to one condition and one clarification.

"It is impracticable for us to take title to the property described in *the earnest money agreement* because of restrictions under the Internal Revenue Code relating to real estate investment trusts. Therefore, we prefer to have Messrs. Welch and Merrill enter into an agreement as provided in the *original* earnest money agreement. Subject to the terms set forth in *the earnest money agreement as amended* we will guaranty that the contract purchasers will make the payments for which provision is to be made in the contract.

"Our obligation to guaranty is primarily conditioned upon successful resolution of *a zoning application on a basis to be approved by both of us.* We wish to make clear what the letter of January 28, 1974 implies, namely, that *the zone change must be granted substantially in accordance with the application approved by us* and that at the time we become bound on our guaranty the time for appeal from a favorable action on *the zone change application* must have expired or, if litigation is commenced, the litigation must have been disposed of and the time for appeal expired on a basis favorable to *the zone change* applicant.

"Subject to the condition and clarification set forth above, the terms of the letter of January 28, 1974 are approved." (emphasis added)

Exhibit 5 is a six page, single-spaced letter dated April 15, 1974, from defendant on its letterhead addressed to plaintiff. The letter provides in part:

"You have advised us that you have entered into *an earnest money agreement* with Lloyd Corporation, Ltd. ('Lloyd') and Linden B. Bowman, Realtor, *dated June 8, 1973, amended June 25, 1973 and on January 28, 1974 ('the earnest money agreement')* for the acquisition of certain real property described therein now owned by Lloyd ('the Land'). The *terms of the earnest money agreement* are to be *modified* as set forth *in a letter* attached as Exhibit A to be written by us to Lloyd. *Such letter* when delivered *shall be deemed part of the earnest money agreement.* This letter, if accepted by you on or before April 20, 1974, will constitute a commitment on our part to lend to you, and an agreement on your part to borrow from us, an aggregate sum of up to $2,000,000 for the purposes set forth below in the event that you enter into a contract with Lloyd *pursuant to the earnest money agreement.* The loan will be made on the following terms and conditions:

"1. <u>Term</u> (original underlining): * * * [A formula for determining maturity of the loan.]

"2. <u>Interest</u> (original underlining): * * * [A formula for determining interest in part on a percentage rate and 'additional interest' to be measured by one-half the net profits of the development and sale of the land.]

"3. <u>Purpose of loan</u> (Original underlining): The amount to be loaned to you will be used by you solely for the following purposes:

"(A)  The initial payment and payment of instalments of principal and interest under the contract into which you enter with Lloyd *pursuant to the earnest money agreement;*

"(B)  Reimbursement to you of such out-of-pocket expenses you have incurred or may incur in connection with *obtaining rezoning* of the Land, not to exceed $20,000;

"(C)  Payment of instalments of interest (other than 'additional interest') owed to us on account of the loan to be made pursuant to this agreement; * * *

"* * * * *

[680]

"6. <u>Conditions of loan</u> (original underlining):
"(A)   We shall have no obligation to make any advance hereunder unless and until:

"(a)   We shall have approved the *applications for zone change* of the Land which you are required to submit pursuant to the terms of *the earnest money agreement* as provided therein;

"(b)   The *zone change* has been approved by all necessary governmental authority *in substantial conformance with the applications approved by us;*

"(c)   The period in which any legal proceedings may be brought to set aside the action in granting *zone change* shall have expired or, if legal proceedings have been instituted within such period, a final determination thereof has been made on a basis satisfactory to us; and

"(d)   You shall have complied with all of the terms of *the earnest money agreement,* shall have entered into a contract with Lloyd in usual form containing provisions consistent with those contained in *the earnest money agreement* and shall not be in default thereunder.

"(B)   On or before the date of the first advance you shall have furnished to us the following documents and complied with the following conditions:

"(a)   You shall have furnished to us a promissory note in form acceptable to us in the amount of $2,000,000, duly executed by you;

"(b)   You shall have furnished to us guaranties of the payment of your indebtedness in form satisfactory to us, executed by the wives of each of you;

"(c)   You shall have furnished to us a mortgage in form satisfactory to us covering the Land and the interest which you are acquiring from Lloyd, which mortgage shall be a first lien on the Land and your interest therein subject only to the rights of Lloyd under its contract with you;
"* * * * *

"7.   <u>Covenants of borrower</u> (original underlining): For so long as you shall be obligated to us hereunder you shall do the following:

[681]

"* * * * *

"(B) Comply with all of the terms, covenants and provisions of *the earnest money agreement* to be performed by you, enter into a contract with Lloyd for acquisition of the Land on the terms set forth in *the earnest money agreement* in the event that you are required to enter into such contract pursuant to *the earnest money agreement,* and comply with all of the terms conditions and provisions contained in such contract;

"(C) Take all steps necessary to comply with the conditions set forth in section 6, and

"(D) Satisfy all of the conditions set forth in paragraph 6.

"8. Our guaranty (original underlining): You have asked us to guaranty to Lloyd that you will perform certain of the covenants contained in the *earnest money agreement.* In order to induce us to deliver such guaranty you will assign to us immediately upon acceptance of this agreement all of your rights under *the earnest money agreement.* At such time as you have fulfilled all of the provisions of *the earnest money agreement* to be performed by you thereunder and are ready to enter into the contract with Lloyd for which provision is made in the *earnest money agreement,* we will reassign to you your rights under *the earnest money agreement* provided that at such time you are not in default hereunder and have complied with all of the conditions to be performed by you prior to the time of the first drawdown or have made arrangements satisfactory to us to assure that there will be such compliance. In the event that you are not entitled to reassignment as aforesaid, then we may exercise your rights pursuant to *the earnest money agreement* in your stead, in which event we will take and hold the Land as security for the performance by you of your obligations hereunder. Any amount which we expend in acquiring the Land will be treated as a loan to you on the terms and conditions herein set forth, which is immediately due and payable. By entering into a contract with Lloyd in our own name we shall not

[682]

waive any right which we may have against you on account of your breach of the terms of this agreement.
"* * * * *

"If the terms herein set forth are satisfactory please so indicate your acceptance thereof on the enclosed copy of this letter and return the same to us. Upon such acceptance this letter will then constitute a binding agreement between you and us." (emphasis added throughout).[3]

Plaintiff indicated his acceptance on the letter itself on April 15, 1974.

### *The Contract*

In its briefs the defendant makes reference, *passim,* to the "contract of April 15, 1974." Defendant's position seems somewhat equivocal as to what documents made up the "contract of April 15, 1974." For example, in defendant's reply brief it is asserted that Exhibits 1, 2 and 3 "constituted the earnest money [ agreement]" between Lloyd and plaintiff and that plaintiff has erroneously assumed that the earnest money agreement was incorporated by reference into "defendant's commitment." Defendant's brief goes on to quote the first paragraph of its letter of April 15, 1974, (which we have set forth in haec verba, *supra,)* and then asserts:

"The only other reference to the earnest money agreement is in paragraph 6 of the terms and conditions as follows:

" '(A) We shall have no obligation to make any advance hereunder unless and until:
" '(a) We shall have approved the applications for zone change of the Land which you are required

---

[3] References to "the earnest money agreement" and to "the original earnest money agreement" and to "the earnest money agreement as amended" and to "an earnest money agreement * * * dated June 8, 1973, amended June 25, 1973 and on January 28, 1974 ('the earnest money agreement')" and to "terms of the earnest money agreement * * * modified as set forth in a letter * * *[to] be deemed part of the earnest money agreement" are emphasized for several reasons to be discussed later in the body of the opinion.

to submit pursuant to the terms of the earnest money agreement as provided therein;' "

That assertion is puzzling in light of the fact that in the material we have quoted, *supra,* from Exhibit 5, there are at least 12 other references to "the earnest money agreement."

The contention that "Exhibits 1, 2, and 3" constituted the earnest money agreement is, also, somewhat surprising, for in its letter of April 15, 1974 (Exhibit 5) defendant insisted that the letter of same date (Exhibit 4) from defendant to Lloyd "shall be deemed part of the earnest money agreement."

It is not clear to us whether defendant is contending that Exhibit 3 (the letter from plaintiff to Lloyd of January 28, 1974) is or is not a part of the contract. Defendant's brief asserts:

"The January 28, 1974 letter (Ex. 3) on which plaintiff relies to obligate defendant to suggest changes was prepared for the signature of defendant. Defendant did not sign the letter but rather executed its commitment of April 15, 1974. Neither of the above quoted references [from Ex. 5, defendant's letter of April 15, 1974] have anything to say about incorporation by reference. Rather, given the sequence of the letters, it is clear that defendant did not want to bind itself to a process of suggesting changes, a process more appropriate to a developer than a lender. Instead, it reserved the right to approve or disapprove the applications which were to be submitted pursuant to the earnest money agreement. One therefore needs to look to Exhibits 1, 2, and 3 to determine what applications are meant. As demonstrated in defendant's opening brief these were the various applications needed to produce final approval of a planned unit development."

If this is not a claim that Exhibit 3 is not part of the contract, there is no problem for us in this particular. If it is a claim that Exhibit 3 is not a part of the contract, we reject the claim. We note the language in Exhibit 5 (defendant's letter) specifically denoting the

earnest money agreement dated June 8, 1973, "amended June 25, 1973, *and on January 28, 1974* as being the earnest money agreement. In light of defendant's numerous references to "the earnest money agreement" in Exhibit 5 and its insistence in Exhibit 4 upon imposing modifications upon the agreement as reflected in Exhibits 1, 2, and 3, defendant's contention that Exhibits 1 through 3 are no part of its contract with plaintiff has a hollow ring to it.

Aside from the language of the quoted exhibits, themselves, there is a complete answer in the record as to what documents make up the contract between plaintiff and defendant. The trial court instructed the jury that the contract was made up of these five documents, and no exception was taken to that instruction. We conclude that the contract consists of Exhibits 1 through 5.

### *The Claim of Breach*

In consideration of its commitment to lend and plaintiff's commitment to borrow "an aggregate sum of up to $2,000,000" as described in Exhibit 5 defendant was to get a mortgage on the real property, interest at 10 percent per annum on funds advanced, and "additional interest measured by one-half the net profits" which might be realized through purchase and development of the property pursuant to the contract. Plaintiff pleaded that defendant breached the contract by refusing to provide plaintiff with the funds called for by the contract in circumstances

> "which defendant well knew would, and in fact did, prevent plaintiffs from obtaining reasonable alternative financing and which defendant well knew would result, and in fact did result, in the termination by Lloyd of its agreement to sell said property to plaintiffs."

Defendant denied that plaintiff had performed all conditions precedent on his part to be performed, denied that defendant had breached the contract and denied that plaintiff had suffered damages.

[685]

Again we state as facts what we find could be established from evidence in the record. (See footnote 2, *supra.*)

On April 16, 1974, the day after Exhibit 5 was made, plaintiff learned from Washington County officials that approval of a PUD could not be obtained for this property within the time contemplated for performance of the contract by plaintiff. It was indicated that approval would take a considerable period of time because of reasons having to do with the Washington County sewer moratorium, the new Washington County zoning ordinance, the possibility of changes in an ordinance which would be advantageous to approval of a PUD on this less than 80-acre tract, and the necessity of coordination with the Washington Square Community Plan then under consideration. There was an indication, however, from the county planning staff that a change of zone from industrial to residential might be accomplished.

This turn of events caused plaintiff to believe that the ultimate goal of the parties for development of the property might best be accomplished by applying for rezoning 50 acres of the property to "RU-30." This designated a zone which would allow for apartment units of a relatively high density. This intermediate step was designed to leave the remainder (18.44 acres) zoned so as to permit office buildings.

On April 26, 1974, plaintiff attended a meeting of BMA and proposed that the parties proceed with application for the change to RU-30 and at a later time seek approval of a PUD.[4] The proposal was discussed and it is apparent that the BMA personnel understood the general plan of attack advocated by plaintiff. There is nothing to indicate that they disapproved or

---

[4] It is not contended by plaintiff that anything that happened *after* April 15, 1974, amended or modified the contract. It is contended that evidence of what happened after that date furnishes evidence of what the parties considered the intent of their contract to be. There will be further discussion of this in the text under the heading, "Ambiguity of the Contract."

that they advised plaintiff that this proposal would not be in accordance with the contract.

On June 6, 1974, plaintiff submitted a 35 page "APPLICATION FOR ZONING MAP AMEND-MENT" to begin carrying out the proposal made on April 26. Between June 6 and early July plaintiff and BMA representatives discussed possible changes and alternatives, and still there was no assertion by anyone that plaintiff's actions were not in accordance with the contract. On July 1 plaintiff wrote to Mangan summing up the actions and discussions since April 26 and indicated his intent to submit the zone change application for 50 acres to RU-30, leaving 18.44 acres of permitted use for office buildings. The letter noted that the Washington County Planning Director "was in accord with this procedure." The letter pointed out that plaintiff had originally envisioned an ultimate development of 1,000 dwelling units and six acres of office-commercial use, but that the proposal "could be 18.44 acres (803,246 sq. ft.) of office-commercial and 1,074 to 1,235 apartment units." The letter closed, "Trusting you approve * * *"

On July 2 plaintiff met with the Investment Committee of BMA and some of its staff members to discuss further the ramifications of the proposal. The investment analyst for BMA asked whether it would be feasible to close the land sale transaction but leave the entire tract as then presently zoned until some time in the future when the most "advantageous mix" could be reasonably determined. Plaintiff opposed this because he felt that without direction from the developers the county would include the tract in the "Comprehensive Plan" as mostly residential, and it would be difficult to obtain the necessary future changes to develop the property if not in compliance with the plan. Vice President Bechen of BMA

"reported that the Trustees of USBanTrust [sic] had indicated that they would not favor *any change* from the present zone unless it provides for a substantial portion of the land to be used for commercial development."

[687]

Plaintiff then retired from the meeting and the committee decided that it would defer action until a meeting of the committee for the following day, at which more members could be present. Again, no one advised plaintiff that he was in breach of the contract for proposing something other than immediate application for a PUD.

The investment committee did meet on July 3, and on that day Mangan and Bechen through separate telephone coversations informed plaintiff that this *committee* would not approve the "proposed zone change application." By letter dated July 5, 1974, *on the letterhead of defendant* but signed by Bechen as vice president of BMA this information was confirmed, and the letter closes,

> "For this reason, the Committee felt that [sic] wisest course would be to decline to approve the zone change application."

The letter is silent as to any contention that plaintiff had breached the contract by failing to apply for and obtain approval of a PUD.

From July 5, 1974, on defendant has taken the position that it was not obligated to perform the contract.

## *Ambiguity of the Contract*

■ One of the two chief arguments of the defendant to support its contention that the court erred in denying its motion for a directed verdict is that the contract unambiguously requires that plaintiff had to submit an application and plan for a PUD and that the admitted failure of the plaintiff to do so constituted adequate grounds for defendant to refuse to perform its commitment. Plaintiff counters that the contract was ambiguous as to whether *only* an application and plan for *a PUD* would satisfy his obligation and that under the evidence the question was properly submitted to the jury. Plaintiff does not deny that the final objective was to obtain Washington County approval of a PUD and to develop the property in accordance

with the approved plan, but plaintiff contends that defendant repudiated the contract without legal justification at such time and in such manner as to frustrate plaintiff's performance.

Defendant asserts that the *language* of the contract is unambiguous, and there is no need for resort to extrinsic evidence to determine the intent of the parties and the obligations imposed. Examination of the five documents which make up the contract discloses at least one interpretation contrary to defendant's position. The first document (Exhibit 1), the original earnest money agreement between plaintiff and Lloyd, supports defendant's position. Exhibit 1 clearly calls for obtention of "rezoning"[5] of the property to a PUD. The rest of the written contract is never so precise. In no other place is there any reference to a PUD as such. Exhibit 2 (the letter of June 25, 1973, from Lloyd to plaintiff) gives Lloyd the right to review plaintiff's "development plan and rezoning proposal" and states:

> "The purpose of this is so that the Lloyd Corporation will feel that the final plan will represent the *highest and best use of the property, creating the highest potential land value.*"(emphasis added)

Exhibit 3 refers to substantially changed conditions (a zoning moratorium and adoption of a "county master plan" in Washington County) and makes proposals, to which Lloyd agreed, concerning planning, preparation and presentation of "the zone change material." This letter, also, promised that plaintiff would make every reasonable effort to incorporate changes in the application suggested by either Lloyd or defendant. This letter, moreover, commenced by proposing that defendant and plaintiff would "work together" to insure a thoroughly professional job would be done in

---

[5] It is not at all clear that approval of a PUD is a zoning decision. Zoning property gives the owner the right to *use* the property in accordance with the zoning (*e.g.,* residential), while approval of a PUD, it may be argued, does nothing more than to particularize the use. We need not decide in this case whether that is a zoning decision.

planning and presentation. In Exhibit 4 (the letter from defendant to Lloyd) defendant expressly approves the "terms set forth" in Exhibit 3.[6]

The interpretation to which reference is above made is that the parties started by contemplating county approval of and development of a PUD but modified this approach by subsequent proposals culminating in defendant's commitment of April 15, 1974, to develop the property to the highest and best use that would produce the highest potential land value. It is this interpretation which plaintiff urges.

The documents are susceptible of still other reasonable interpretations, but it is unnecessary to our purposes to spell out all of them. The contract is not unambiguous.

Even if it were to be held that this contract was not, on its face, ambiguous, evidence could be received as an aid to determination of the meaning to be given the contract. *Card v. Stirnweis,* 232 Or 123, 130, 374 P2d 472 (1962). In that case we quoted with approval from Restatement of the Law, Contracts, § 230, which provides:

> "The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean."

---

[6] Plaintiff notes in his brief (without contradiction by defendant in the reply brief) that there is only one reference to a planned unit development in the contract. On the other hand, the contract contains over two dozen references according to plaintiff:

"In Exhibit 1: 'a rezoning application,' 'rezoning' (five times), 'a development plan' (twice). In Exhibit 2: 'development plan' (twice), 'rezoning proposal' (twice), 'the final plan,' 'rezoning' (five times). In Exhibit 3: 'rezoning' (twice), 'zone change' (twice), 'rezoning proposal,' 'zoning application.' In Exhibit 4: 'zoning application,' 'zone change' (three times). In Exhibit 5: 'zone change' (three times)."

We further indicated our approval of § 235, clause (d):

"(d) All circumstances accompanying the transaction may be taken into consideration, subject in case of integrations to the qualifications stated in § 230."

The "Comment on Clause (d)" follows:

"Comment on Clause (d):

"e. The court in interpreting words or other acts of the parties puts itself in the position which they occupied at the time the contract was made. In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement."

We continued by quoting from Corbin on Contracts,§ 579 to like effect:

"It is true that the language of some agreements has been believed to be so plain and clear that the court needs no assistance in interpreting. Even in these cases, however, it will be found that the court has had the aid of parol evidence of the surrounding circumstances. The meaning to be discovered and applied is that which each party had reason to know would be given to the words by the other party. Antecedent and surrounding factors that throw light upon this question may be proved by any kind of relevant evidence." (footnotes omitted)

*See also* ORS 41.740 and 42.220.

There is evidence[7] in the record from which the jury could have found that during the negotiations leading up to the making of the contract there was taking place in Washington County changes in attitudes and laws regarding property development and land use planning. A new county plan and zoning ordinance

---

[7] There is, also, a great deal of evidence to the contrary, and defendant has drawn our attention to it. Contrary evidence is of no avail to defendant or this court on appeal on this assignment of error. *Wootten v. Dillard,* 286 Or 129, 592 P2d 1021 (1979).

were passed between the time of the original earnest money agreement (Exhibit 1) and defendant's letter of April 15, 1974 (Exhibit 5).[8] From this evidence the jury could infer that plaintiff would not have been willing to commit himself to obtaining immediately (or even within a relatively short time) a PUD or nothing. The point is that this circumstance if found by the jury to exist is relevant to interpretation of the parties' writings.

Evidence of the parties' construction or interpretation of the contract or their conduct *after* its making is relevant to the issue of the true meaning or intent of the parties. *Krieg v. Union Pacific Land Res. Corp.,* 269 Or 221, 230, 525 P2d 48 (1974): "The conduct of the parties to a contract and their practical interpretation of it is an important factor when there is a dispute over its meaning."

In our discussion, *supra,* under "The Claim of Breach" we have already alluded to some of the events which transpired *after* April 15, 1974. As we there noted, and iterate here, this is not for the purpose of demonstrating that the "contract of April 15, 1974" was modified or amended; it is rather to show evidence of what the parties intended by the language of their contract. Defendant contends that such evidence is not competent because there is nothing to show what the trustees of defendant did; *i.e.,* the evidence only shows actions by the representatives of BMA, which was merely "adviser" to the defendant. We believe the evidence already mentioned and other evidence to be discussed will permit, if not indeed demand, a contrary inference.

Throughout the negotiations leading to making of the contract plaintiff and Bowman (for Lloyd) dealt with BMA (and for the most part, Mangan) as the authorized representative of defendant to make the

[8] The evidence shows the timing of these changes, which we have had other occasion to review in *Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 581 P2d 50 (1978).

contract. Exhibits 4 and 5 were signed by one Andrew Norris over the typed legend, "Authorized Signature." It appears that Norris was at the time an assistant treasurer of defendant, but this is about the extent of any direct participation by defendant in making the contract. (Interestingly enough Mr. Norris was apparently at the same time a director and "President and Chief Executive Officer" of BMA). As mentioned above, however, plaintiff and Lloyd dealt primarily with Mangan.

The record indicates that Mangan wore many hats throughout this period. During 1972, 1973 and 1974 he was a vice president of BMA and a member of its "Investment Committee." On June 10, 1974, he was elected to be a director of BMA. On October 16, 1973, he wrote a letter concerning this transaction to plaintiff on Mangan's stationery as "Senior Vice President" of the United States National Bank of Oregon. He wrote other letters *on defendant's letterhead,* signing them over the legend, "Vice President" without any indication on the letter, other than the letterhead, as to what vice presidency was being indicated.[9] These letters were dated and addressed as follows: July 31, 1973, to plaintiff; August 1, 1973, to Bowman; August 15, 1973, to Lloyd with copy to Bowman; and August 16, 1973, to plaintiff.

On April 19, 1974, the minutes of a meeting of the Investment Committee of BMA indicate that the committee resolved to "ratify and confirm the actions of the officers of the Trust in having consummated" the loan commitment to plaintiff.

On June 19, 1974, *on defendant's letterhead,* BMA through Bechen advised plaintiff that BMA's staff was in the process of reviewing

> "your proposed zone change application for the Lloyd property. We fully agree with you that the wisest

---

[9] We are not willing to presume that Mangan came into possession of defendant's stationery or used it wrongfully. *Compare* ORS 41.360(1), (4), (11), (19), (20) and (33).

course of action is the one which will allow the greatest future flexibility. After doing some independent research on the matter, our feeling is that this would be accomplished best by postponing the request for zone change and concentrating efforts on securing an advantageous formulation of the Washington Square comprehensive plan. The Washington County planning staff has indicated its willingness to include in its plan alternatives for either high density residential or labor intensive industrial uses. We believe this course of action would provide greater future flexibility than would be realized with a present zone change to RU-30.

"A member of our staff will be attending the June 25 meeting in the office of the Department of Environmental Quality, and our final response to your proposed zone change application will be made shortly thereafter."

On May 1, 1972, defendant and BMA made an "ADVISORY AGREEMENT" (which was in effect at all relevant times). Under that document BMA had the general duty to

"(c) on behalf of the Trust, investigate, *select and conduct relations with* consultants, accountants, mortgage originators, correspondents, lenders, servicers, technical advisers, attorneys, *brokers,* underwriters, corporate fiduciaries, escrow agents, depositaries, custodians, agents for collection, insurers, insurance agents, banks, *builders, developers and other mortgagors* and mortgage and investment participants, and persons acting in any other capacity deemed by the Trustees necessary or desirable, and enter into appropriate contracts with, or employ, or retain services performed or to be performed by, any such parties in connection with the mortgages or investments acquired, sold or otherwise disposed of or committed, negotiated, or contemplated to be acquired, sold, or otherwise disposed of, and substitute any such party or itself for any other such party or for itself;" (emphasis added)

In face of all this defendant contends that the actions of the officers of BMA are not chargeable to

the defendant "when it comes to construction of the contract." We reject that contention if it is intended to mean that the jury was not entitled to consider the actions of BMA officers to resolve ambiguity as to what plaintiff and defendant intended by their contract.

There was further evidence, by way of testimony, as to the intent of the parties. Mangan was testifying as to the time period of December, 1972:

"Q. * * * Had you and Mr. Welch had discussions on the subject of a PUD, residential and commercial?

"A. I don't recall that we did or we didn't. The PUD doesn't or didn't and doesn't mean that much to me, that that would stick with me."

Mangan further testified:

"Q. Now Exhibit 161 are the meetings of April 19, 1974 of BMA, and that's the meeting where the committee resolved to ratify the recommendation of the commitment; is that correct?

"A. I believe that's correct, yeah.

"Q. And then [Exhibit] 162 is a meeting of BMA on April 26, 1974. You were present, and that's the meeting in which Mr. Welch described a plan to apply for a RU-30 zone; is that correct?

"A. That's correct.

"Q. And isn't it a fact, Mr. Mangan, that the minutes of these two meetings, to your knowledge, do not represent any significant change in the concept of the development?

"A. I'd agree with that.

"Q. So, I take it that at least with respect to the nature of the development, that as you've indicated, remained—did not change throughout the period beginning in late '72 right on up through the end of April '74?

"MR. HILLIARD [defendant's counsel]: I object to the form of the question until he defines the word 'nature.'

"MR. MEYER [plaintiff's counsel]: The nature meaning high density residential with maybe eight or ten acres of commercial.

[695]

"THE COURT: Do you still have the same objection?

"MR. HILLIARD: No.

"A. Well, I'm confused. You use nature in concept, and I'm not sure what you're trying to have me say, but the concept or the nature of the development, as I understand it, is that it was to be in residential use.

Now when you mix in with that a zoning with so many of this and so many of that, is where you leave me. I was looking at it in a broader way, as to its use. The type of what you call the zoning, didn't matter that much to me.

"Q. All right.

So that what the use was, high-density residential with some related commercial, that use and that concept was consistent right on through?

"A. I think so."

Defendant called Gregory Howe as a witness. He was a vice president of BMA (and a lawyer), and he testified in part:

"A. Well, yes. A letter [from plaintiff to Mangan dated May 1, 1974] was addressed to Mr. Mangan—I don't know what conversations Mr. Welch had with Mr. Mangan—I was in receipt of a copy of the letter. I noted that he wanted to avoid going in for a PUD application at this time, at that time. It didn't make any difference to me at the time.

"* * * * *."

Finally, Bechen testified concerning the Investment Committee of BMA meeting of July 2, 1974:

"Q. Did anyone at that meeting ever tell Mr. Welch that he had failed to supply additional data?

"A. Not that I recall, no."

"Q. Did anyone at that meeting advise Mr. Welch that he should have put in a development plan different than what he had?

"A. Not that I recall. Not while he was present.

"Q. Did anyone advise him while he was present that he should have put in a PUD plan rather than a zone change application?

"A. Not that I recall, no."

[696]

## Summary on Liability

The record has evidence which will support defendant's theory that the contract is not ambiguous, that plaintiff was required to submit and obtain approval of a plan for development of a PUD and no other plan, and that he failed to do so. On the other hand, there is abundant evidence from which the jury could find that the contract did not require a PUD, except as possibly the final objective to be attained to make the venture most profitable for the parties. In particular the "Conditions of loan" contained in Exhibit 5, parts (A)(a) and (b), evidence that defendant was required pursuant to Exhibit 3 to work together with plaintiff

"* * * to insure that a thoroughly professional job is done in planning, preparation and presentation of the zone change material[,]"

and to request changes in the application for zone change if the application was unsatisfactory to the defendant and further to attempt to arrive at a "mutually satisfactory basis." Exhibit 3, by which defendant was bound, provided that the contract would terminate

"[i]f agreement cannot be reached on any such changes within 30 days of submission * * *."

There is evidence to support plaintiff's contention that he had performed satisfactorily until he was advised by BMA that *its investment committee* declined to approve the application. There is evidence that defendant, whether through BMA or any other agent it might choose, had agreed to suggest changes for plaintiff's consideration, but that defendant had refused to do so, thereby making it impossible for plaintiff to perform further under the contract. The jury has weighed the conflicting evidence and resolved the matter in favor of plaintiff. In short, the jury could find from the evidence that plaintiff gave defendant what defendant had bargained for, but that defendant did not give plaintiff what he had bargained for, namely, the chance to work with defendant to develop a mutually acceptable proposal to submit to Washington County

for the purpose of obtaining approval for development of the property to earn a maximum profit on the venture.

### Damages

Defendant's second chief contention that verdict should have been directed in its favor upon its motion was presented to the trial court as follows:

> "Four, plaintiff has failed to present sufficient evidence to produce a jury question on his alleged damage claim, which is set forth by way of purported lost profits."

In its brief defendant summarizes its argument on this aspect as follows:

> "Defendant's argument on damages is twofold. First, plaintiff's claim is speculative. His witnesses predict precisely what configuration a county commission will approve for future development and exactly when, over an eight year period, developers will repurchase parcels. Plaintiff takes this pro forma, which was never presented to defendant or even discussed by the parties, applies constant compounding inflation rates on the bare land, assumes that rent will increase fast enough to cover increased land and building costs, and more than triples the current asking price for the bare land. The exercise is conjecture and is based on factors not consistent with economic conditions in 1974.
>
> "Second, plaintiff's appraiser gave an opinion on a matter which was well beyond his expertise. He was a real estate appraiser, but he declined to value the land. Instead he construed five documents to ascertain Welch's right and gave his opinion as to the value of that right."

The witness to whom defendant refers is one Robert S. Newell. Having first testified to his qualifications to give opinion testimony, Newell answered, "Yes," to the following question:

> "Q. And based upon your experience and based upon your investigation, Mr. Newell, do you have an opinion as to the value of the equity in this property which would be Mr. Welch's, had these contract documents been executed?"

[698]

The witness explained that by "executed" he meant "placed into effect." Over objection the witness was allowed to state his opinion that the value was $1,500,000.

Prior to calling witness Newell, plaintiff had adduced testimony from one Martin R. Crampton, Jr. Crampton was employed as Director of Planning and Development for Multnomah County at the time he testified. Prior to that he had been Planning Director for Washington County from January, 1973, through March, 1975. He had testified to his qualifications in the field of land use planning when he was asked to express an opinion as to what zone change and use of the land would have been permitted for the parcel in question. Over objection he expressed the opinion that under the Washington County Comprehensive Plan and the zoning ordinance (both of which he claimed to have drafted) the property would have been rezoned RU-30 "from a technical point of view" and that as an overlay or conditional use,

> "It would be very probable that it would develop as a PUD. As a matter of fact, it would be the staff's suggestion to the Planning Commission and the Board that the site not be allowed to develop unless it were a PUD."

Plaintiff, also, called David C. Leland, who testified to his education, training and experience in the fields of urban and economic geography, land use planning in both the private and public sectors, market feasibility studies, and the drafting of public need statements for zone changes. He testified that in his opinion an "appropriate and permissible" use of this property would be a combination of RU-30 together with a neighborhood planned unit development. He opined that a mix of 6.84 acres office-commercial, 10.27 acres retail-commercial, 10.27 acres "circulation" and the balance of some 41 acres in residential would be the highest and best use of the property and would be a reasonably probable use. He testified that on the 41 acres he would recommend development of 1,600 residential units.

On the basis of this evidence and his own expertise in the fields of appraisal, feasibility studies and market analysis, and upon his own study of this property Newell testified to his opinion of the profits which plaintiff could reasonably have been expected to make from this venture had his performance not been thwarted. In doing so he assumed a certain rate of inflation for "ready-made multifamily lots" and interest rates over the development period. He further assumed a certain rate of inflation in rental rates and a development schedule. These assumptions were based upon either his own testimony drawn from his own experience or upon other evidence in the record and his inferences therefrom.

Defendant objects to this as being a "pro forma" development and amounting to a "pro forma schedule of performance and cannot support an award of lost profits." Defendant cites *Delaney v. Georgia-Pacific Corp.,* 278 Or 305, 325, 564 P2d 277 (1977). That case was a suit in equity, in which this court as trier of fact "anew upon the record," ORS 19.125(3), rejected a "pro forma" projection of profits as being too speculative. This is an action at law in which we are bound by the jury verdict unless we can say "there is no evidence" to support it. Defendant, also, relies upon *State Highway Com'n. v. Deal et al.,* 191 Or 661, 233 P2d 242 (1951) in which the landowner sought to fix market value of the land by showing that the land could be developed through subdivision and then showing the value of each lot. That case is not in point; it was concerned with the value of the property on the date of taking. This case is concerned with the value of plaintiff's contract or, conversely, damages for breach of the contract.

Defendant contends that Newell did not give an opinion within the field of his expertise. Defendant appears to be laboring under the impression that Newell qualified *only as a land appraiser.* This is simply not so, as can be seen from our discussion of

this witness' testimony, *supra.* Defendant, also, objects that the witness in part expressed his ultimate opinion based upon his characterization of the relationship between plaintiff and defendant as being a joint venture. It is true that the witness did that over objection, but defendant is not harmed. That characterization is not erroneous. *Compare Aikin & Flavel v. Leonard & Green,* 1 Or 224 (1856).

■ Defendant further contends that the witness, no matter how well qualified, cannot express an opinion as to the very fact in issue, *i.e.,* the "value of plaintiff's contract right." Defendant cites such cases as *Wallace v. American Life Ins. Co.,* 111 Or 510, 225 P 192, 227 P 465 (1924). The cases upon which defendant thus relies are old and were decided at a time when the courts were reluctant to allow witnesses to address the ultimate issue by opinion evidence. This court has expressed the more modern rule in *Ritter v. Beals,* 225 Or 504, 525, 358 P2d 1080 (1961):

> "The correct rule is that an expert's fitness to answer opinion questions must first satisfy the discretion of the trial judge. The expert then may express an opinion on an ultimate fact if the ultimate fact cannot be equally well decided by the jury from the same evidence upon which the expert has based his opinion. [citations omitted] The decision whether to receive the testimony should be left to the sound discretion of the trial judge. Following the preliminary screening by the trial judge, the jury ultimately passes upon the credibility of the witness, the soundness of his judgment, and the existence of the facts upon which his opinion was predicated."

■ Defendant complains that plaintiff was allowed to give evidence of a probable zone change. He argues from cases cited that such evidence is improper in fixing value because zone change is not the issue but whether a potential buyer will believe that the zone change is probable in arriving at value. This is not a case in which the issue is the value of the land except as an incident, and the probability of zone change here

[701]

went to a different issue, *i.e.,* whether the contractual expectations could have been fulfilled.

■ Defendant next complains that at the time of making the contract, the parties contemplated only a thousand units of residential building and about six acres of office-commercial; therefore, argues defendant, profits must be restricted to such a mix as the maximum recoverable. Even if that be assumed as a premise, plaintiff was entitled to show that a higher density development was attainable to demonstrate the inherent conservatism of the contractual objective. Moreover, it is not unreasonable to assume that had the performance of the contract been carried forward and the parties had found it feasible to develop according to the figures projected by Leland and thus obtain greater profits, they would have done so even though they did not envision the complete extent of the profitability at the outset.

■ Defendant additionally complains that Newell should not have been allowed to use an eight percent inflation rate in his projections. Defendant cites evidence to support that position. The answer is there was evidence, as already discussed, to permit use of that figure, and the jury has resolved the conflict in plaintiff's favor.

Most of the defendant's arguments which we have now discussed are an attack upon the opinions of the witnesses called to give testimony as "experts." The trial court gave substantially the standard instruction concerning this type of evidence:

"* * * Ordinarily, the law does not allow a witness to express an opinion. However, a witness who has special knowledge and skill, experience or training in a particular field may give an opinion as to any matter in which the witness is so skilled.

"In determining the weight to be given such an opinion, you should consider the qualifications and the credibility of the witness and the reasons given for the opinion. You are not bound by any such opinion of an expert witness, but you should give it

the weight, if any, to which you deem it to be entitled."

This instruction clearly put before the jury the factors to be considered by the jury in assessing opinion evidence as specified in *Ritter v. Beals, supra.* The proof of the pudding that the jury did exactly what it was empowered to do in assessing the weight of this opinion evidence appears from the fact that its verdict was for $200,000, not the $1,500,000 opined by Newell.

■ Defendant's final attack upon the damages aspect of the case is further divided. First, defendant argues that plaintiff is restricted to the cost of obtaining money elsewhere. As we have already pointed out, loaning money was not the only obligation of the defendant under this contract. This joint venture at least obligated defendant to take part in the formulation of the application and plan for development. Furthermore, the jury was instructed that before plaintiff could recover for lost profits, the jury must find from the evidence that plaintiff was not able to obtain funds elsewhere to complete the purchase of the property and that defendant knew or had reason to know on April 15, 1974, that such would be the case. This position of defendant is not well taken.

Second, defendant urges that lost profits is not a possible basis of recovery upon an untried business venture. Starting with fundamental concepts, we can safely say that consequential damages are recoverable if they are reasonably foreseeable. It has been so considered since *Hadley v. Baxendale,* 9 Ex. 341 (1854). Here the very purpose of the contract was to produce profit for the parties. Not only was defendant to receive the then fair rate of return of 10 percent per annum ordinary interest on any money it loaned to plaintiff on the security of a mortgage on property, the value of which had been fixed by contract by Lloyd to sell to plaintiff at $1,192,000, but defendant was to receive "additional interest" measured by one-half the expected net profits. A document was received in

evidence (Exhibit 154) that was prepared for presentation to the Investment Committee and the trustees of defendant. This document estimated the value of the "Completed Project" as being a minimum of $3,000,000. The same document estimated the "Yield to Trust" as being 25 percent. That document dated April 5, 1974, was approved the same day by polling the trustees. Loss of profits from nonperformance of the agreement, if it occurred, was foreseeable.

■ Defendant contends that the lost profits are recoverable only if proven to a "reasonable certainty." Quoting from *Buck v. Mueller,* 221 Or 271, 351 P2d 61 (1960), defendant says

> "Reasonable certainty in turn requires that 'actual evidence' constituting 'substantial data' must be supplied in support of the claim."[10]

It is interesting that in *Buck v. Mueller* we noted that lost profits may be recoverable despite an untried venture. In accord:

> "Loss of profits will not be denied even though plaintiff does not rely on a past history of profitable operations if they are established by other factual data to a reasonable certainty." *Schafer v. Sunset Packing Co.*, 256 Or 539 at 544-5, 474 P2d 529 at 531 (1970).

The real use of the term reasonable certainty seems to be to screen out an issue from the jury when the court has concluded that the evidence, taken as a whole, is clearly insufficient to establish the fact sought to be proved. The courts should be just as wary here in exercising the screening process as in negligence cases. *See Stewart v. Jefferson Plywood Co.,* 255 Or 603, 469 P2d 783 (1970) for exposition of exercise of this function, and *compare Kirby v. Sonville,* 286 Or 339, 594 P2d 818 (1979); *Jacobs v. Tidewater Barge Lines,* 277 Or 809, 562 P2d 545 (1977). To paraphrase,

---

[10] Speaking for himself, this writer does not understand the terms used in the definition anymore than he understands the term "reasonable certainty" standing alone. See my special concurring opinion in *Hardwick v. Dravo Equipment Company,* 279 Or 619, 630, 569 P2d 588 (1977). I there advocated the abandonment of the term and that the statutory standard of "preponderance of the evidence" be used.

the court should intervene only when it can say that the evidence is *clearly insufficient* to establish the claim of lost profits. This does not mean that the court should withdraw the question just because the court might not be convinced by the evidence. *Compare Wootten v. Dillard, supra.* If reasonable men could be persuaded of the validity of the claim on the evidence presented, the jury must be allowed to make the decision.

In any event the term "reasonable certainty" as a screening device may not now be as favorable a concept for defendant's resisting claims of lost profits as it once was under older decisions of this court. Plaintiff draws our attention to the recent case of *Cont. Plants v. Measured Mkt.,* 274 Or 621, 547 P2d 1368 (1976) where the defendant, as does this defendant, contended that the fact that a loss of profits had occurred was not proved with "reasonable certainty" as required in our earlier cases. We said:

> "* * * What is actually meant by 'reasonable certainty' is discussed in McCormick, Damages 100 § 27 (1935), in which it is stated,
>
> > "* * *[I]t appears that the epithet "certainty" is overstrong, and that the standard is a qualified one, of "reasonable certainty" merely, or, in other words, of "probability." ' "

274 Or at 624. *Compare North Pacific Lbr. v. Moore,* 275 Or 359, 366, 551 P2d 431 (1976).

We conclude that the data and evidence presented by plaintiff was all that could be expected in the circumstances of this case. To hold otherwise would be tantamount to holding that the defendant could breach this particular contract with impunity. That the evidence was not as strong as might be possible in different circumstances is not a sufficient reason to refuse to submit it to the jury in this case.

The defendant had whatever benefit the psychological impact of the term "reasonable certainty" may have on the trier of fact. Substantially in accordance

[705]

with instructions requested by the defendant, the judge did instruct the jury that plaintiff must prove his claim to lost profits to a reasonable certainty. The defendant's requested instructions did not give any definition for the term, and the court's charge to the jury likewise failed to do so.

The fact that the jury awarded only $200,000 in the face of Newell's opinion of $1,500,000 in lost profits indicates an impact upon the jury's assessment of the weight of the evidence.

The court did not err in denying the motion for directed verdict.

### The Cross-Appeal

Plaintiff cross-appeals asking that the case be remanded for a new trial on the issues of damages only. The cross-appeal is based upon claims that the court erred in excluding evidence relevant to the amount of damages, in mis-instructing the jury as to the quantum of proof necessary to establish lost profits and the issue of mitigation of damages and in denying certain items claimed upon the cost bill for disbursements for depositions and fees paid to experts.

■ The trial court instructed that plaintiff must prove his damages "to a reasonable certainty," that a claim for lost profits must be proved "with reasonable certainty" and plaintiff would only be entitled to recover "reasonably certain" profits. We quote plaintiff's exception from his brief as follows:

> "I don't have that clear of notes, Your Honor, that I can point to it.
>
> "I know Your Honor did give instructions, I think, on the part which were satisfactory, and my objection goes to the extent that perhaps the instruction on the amount of damages may have been infested with a little bit of the reasonable certainty problem on fact of damages."

We shall assume, *arguendo,* that this exception was sufficient.

For three main reasons we find the instructions not to be reversible error. First, no definition of "reasonable certainty" was given by the court to indicate that these words meant anything greater in weight than "preponderance of the evidence," and in another part of the charge the judge told the jury:

"Accordingly, in this case, the plaintiff has the burden of proof on every issue in the case. The plaintiff must prove his case by preponderance of the evidence, and in the absence of such proof, the plaintiff cannot prevail as to any particular claim he has made in his amended complaint.

"Preponderance of the evidence simply means the greater weight of the evidence. It is such evidence that when weighed with that opposed to it has more convincing force and is more probably true and accurate."

These instructions came later than those concerning reasonable certainty, and there is nothing to indicate the instructions on preponderance were qualified by the earlier instructions.

Second, the plaintiff invited the court to instruct in terms of "reasonable certainty." Plaintiff's Requested Instruction No. 40:

"I instruct you that the essential ingredient of proof of damages to a reasonable certainty is the supporting data. The question of whether the supporting data is sufficient to satisfy you as to the amount of such damages is a question of fact to be determined by you, the jury, based upon the evidence of the experts, the appraisals, the estimates and the other evidence submitted to you."

In addition to his requested instruction plaintiff submitted a trial memorandum to the court in which he expressly stated and recognized that

"while the fact of damages must be established with reasonable certainty, the amount need only be proven by the best reasonable estimates available."

Third, in another part of plaintiff's exceptions to the court's charge, which was not quoted in his brief,

he iterates the theme of his trial memorandum that although the fact of damages must be established with reasonable certainty, the amount need not be.

In addition to those three points, both parties (where it has suited them) have pointed out to us that "reasonable certainty" means nothing more than "probability" as described in the quotation from McCormick found in *Cont.Plants v. Measured Mkt., supra,* and in light of the failure of the trial court to say it means anything other than probability (preponderance), we find no error requiring reversal on this ground.

The court instructed the jury that plaintiff was under a duty to mitigate his damages. The instruction can fairly be read to place upon the plaintiff the burden of proof in this respect.[11] Were that all to the matter, reversal might be warranted, but the instructions taken as a whole reveal that the instruction on mitigation given in this particular case went to the right of the plaintiff to recover at all. The instruction was tied in to instructions that plaintiff could not recover at all unless he could show that he was unable to obtain funds elsewhere to buy and develop the Lloyd property. (Plaintiff did produce such evidence.) The instruction on duty to mitigate as given here would have required the jury, had it found other funds available, to find its verdict for the defendant. The jury resolved this question by its verdict. To phrase it as defendant does in its brief:

> "* * * The jury concluded that plaintiff had a right to recover and, as a predicate to that conclusion, had to have found that no other funds could be had."

We find no error in this respect to warrant reversal.

■  Plaintiff's witnesses, Leland and Newell, both testified to the number of dwelling units which could be built on the property and as to mixes of commercial

---

[11] In the usual case the party asserting failure to mitigate would have the burden of proof and pleading. Defendant's answer in this case is a mere general denial.

and office property and circulation upon development of the property. Plaintiff, also, called Gregory Baldwin, an architect and planner, who testified at some length as to the proper mix for this property. By words and slides he demonstrated the type of development he opined would be proper. Plaintiff assigns as error that Baldwin was not permitted on direct examination to introduce additional testimony, diagrams and a model further demonstrating the concept he envisioned for development of the property. Plaintiff, also, claims error for failure to permit such evidence upon rebuttal after defendant's witness had testified as to his opinion on permitted density of use of the property.

Having examined the record, we find that we would not be in a position to reverse the trial judge on this issue no matter which way he ruled. The evidence was either cumulative or tended to be so. The trial judge exercised his discretion as to whether it was cumulative and found it to be so. We will not on this record disturb that ruling.

When we take into consideration the length of this trial, the complexities of the issues, and the volume of the evidence, we would expect some lapses on the part of all concerned. Necessarily there must be close questions upon whether asserted error is truly error, and even if so, whether it is reversible error. In considering the claims of error asserted thus far by plaintiff and discussed above, we acknowledge that the goal of the law is a perfect trial, but that all that is actually required is a fair trail. That we believe plaintiff had.

■ Lastly plaintiff assigns as error the refusal of the trial judge to allow disbursements for depositions not read at trial and disbursement for expert witness fees. Plaintiff points out that the depositions were necessary in every sense of the word to prepare the case for trial and that the fees were necessary to obtain expert opinion and to present it at trial. The statutes do not permit recovery of such disbursements. Until the

legislature acts to allow such disbursements the courts are powerless to compensate parties for such items.

The judgment is affirmed on both appeal and cross-appeal.