[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1319 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1320 
These consolidated appeals come here after a trial of the personal injury actions of the three minors, who are the appellees. The jury awarded the children a total of over 2.5 million dollars compensatory and punitive damages for their injuries sustained in the collision between their vehicle and the truck driven by defendant Dale Cartee for defendant Osborne Truck Lines, Inc. The trial court entered judgments on the verdicts and denied defendants' motions for judgment notwithstanding the verdict, or, in the alternative, for a new trial.
Defendants raise numerous allegations of error relating to closing arguments of plaintiffs' counsel, evidentiary rulings, instructions to the jury, and other matters.
The accident occurred in the following manner. Dale Cartee drove a tractor-trailer truck as an employee of Osborne Truck Lines. On the day of the accident, September 15, 1981, he arose at 4:00 a.m. after spending the night in Missouri. He drove to St. Louis, where he delivered his cargo and picked up another load. After delivering that cargo in O'Fallon, Missouri, Cartee began his return trip, arriving in Muscle Shoals, Alabama, around 8:00 p.m. He called his dispatcher, who instructed him to *Page 1321 
proceed to the Reynolds Metals plant in Sheffield, which was only a few miles away.
As he traveled east approaching the Reynolds plant on 2nd Street in Sheffield, Cartee prepared to turn left to enter the plant gate. He testified that he turned on his left turn signal about 150 yards before he reached the turn. As he turned across the two westbound lanes of 2nd Street, he heard the crash of a vehicle hitting the side of his truck. He stopped the truck and walked around it, where he saw the plaintiffs' Volkswagen van wrecked against the side of his trailer. Reba Langston was in the back seat, James Samuel (Sonny) Langston III had been thrown out the door, and Tommy Whitten was pinned in the front seat.
Tommy suffered fairly minor injuries: scrapes, bruises, and a broken rib. Reba and Sonny suffered severe injuries, including numerous broken bones and lacerations. Reba and Sonny were both in body casts for several months, but eventually recovered with some permanent impairment. Reba has a disfiguring scar across her neck. The jury awarded $1,525,000.00 to Reba, $1,000,000.00 to Sonny, and $56,000.00 to Tommy.
 Closing Arguments
The defendants argue first that the trial court erred in overruling objections to portions of the plaintiffs' closing arguments. The first of these matters concerns a question to the jury about how much it would take to punish defendant Osborne Truck Lines as a corporation. In support of the proposition that this was improper argument, defendants cite such cases as Liberty National Life Ins. Co. v. Kendrick,282 Ala. 227, 210 So.2d 701 (1968); Alabama Fuel Iron Co. v.Andrews, 212 Ala. 336, 102 So. 799 (1925); and Alabama Fuel Iron Co. v. Williams, 207 Ala. 99, 91 So. 879 (1921).
While some of the argument may have been improper, the only ruling presented for our review is the overruling of an objection during rebuttal argument by one of plaintiffs' attorneys. The same attorney had asked essentially the same question without objection during his initial closing argument. Cf. B M Homes, Inc. v. Hogan, 376 So.2d 667, 673 (Ala. 1979), applying the rule that prejudicial error may not be predicated upon the admission of evidence which has been admitted at some other stage of the trial without objection.
Moreover, defense counsel made statements in closing argument regarding the status of the defendants, including the following:
 "If they talk to you about a corporation, and talk to you about a corporation as if it was some of — it's people and a corporation can only be responsible and liable in a court of law like this if the people in the corporation did something wrong and therefore do not let your judgments of this be swayed by thinking that it's something off over yonder separate and apart from the men and the women that make it up because it's only that, it's only the people who are part of the corporation.
 ". . . We all have prejudices. I'm afraid that a lot of us have prejudices against trucking companies, truck drivers. . . .
 ". . . But don't let the fact that the defendants are a trucking company and a truck driver determine the way in which you rule in this case. I would ask you, under the pledge that you gave me for my clients, to decide this case as if it was — what stereotype do we have, a little old school teacher, that's supposed to be driving my mother back here driving the car down there. . . ."
The context of the argument to which defendants objected shows that it was a reply in kind to statements of the sort quoted above:
 "Mr. Young and them have talked about sympathy. We don't want your sympathy; we want y'all to do your duty, but at the same time we don't want you to be held back by a fear that you're going to be unfair to somebody. They say don't be unfair to Osborne because *Page 1322 
it's a corporation. They say a corporation is made up of people and they're right. But we can't sue those people, we have to sue the corporation. They say don't be unfair and prejudiced just because it's a corporation but at the same time you've got to consider in deciding on the question of punitive damages, what it would take to punish this corporation. Can you punish Osborne corporation with an amount of money that would punish one of us? Ten thousand dollars would punish me, but would that punish this corporation that they're asking you to compare with? I told you in the beginning — [objection interposed]."
Arguments which are replies in kind or are provoked by arguments of opposing counsel do not amount to reversible error. Lawrence v. Alabama Power Co., 385 So.2d 986 (Ala. 1980); Central of Georgia Ry. Co. v. Phillips, 286 Ala. 365,240 So.2d 118 (1970); St. Clair County v. Bukacek, 272 Ala. 323, 131 So.2d 683 (1961). The remarks to which defendants objected come sufficiently within this rule that the overruling of the objection was not reversible error.
Defendants next argue that plaintiffs' counsel improperly requested the jurors to consider how much they would take to have their children injured as these plaintiffs were, and that the trial court improperly overruled defendants' objections. This colloquy went as follows:
 "Mr. Young is probably going to say something about a suit for five million dollars. Well, let me talk about a family. Talk about a family and a man comes in and says I'm going to give you five million dollars family, but here's what you got to do. You got to agree to let your two children be in a van that's in a crash, like what these children were in. And you've got to agree —
 "Mr. Young: Your Honor, we object to the argument that Mr. Self is making at this time. It's an inappropriate argument to argue that before an accident a person could be offered any amount of money to have someone undergo injuries. It is an improper argument to use that as measure of damages for award of damages after an accident has occurred. It is an argument that Mr. Self knows is inappropriate. We again request the Court to request Mr. Self to argue things he knows is proper. That just simply is not an appropriate argument and Mr. Self knows that it isn't.
"By the Court: Overruled.
 "Mr. Self continues; And you've got to agree to have them both busted up, horribly injured, miserably twisted on the roadway. And you've got to agree that they go through all these operations and all this pain and all these body casts, and you've got to agree that they're going to have some permanent problems the rest of their lives. You've got to agree that they face death. Would you take five million dollars?
 "Mr. Young: Your Honor, at this time we renew our objection that he has completed it [sic]. That is an improper argument and we move for the Court to instruct the jury that it is not a proper argument, it is not a measure of damages in Alabama, nor a legal way to measure damages, what a person would take in anticipation in advance of an accident to go through an injury such as this.
"By the Court: Overruled."
 "Mr. Self continues: If they came to this family and said unless you pay me five million dollars this is going to happen, I know I'd mortgage my eternal soul to come up with that money to keep it from happening to my kids. And why is this any less important than property damage? If it was Osborne's truck and they had a cargo and they had a trailer they'd want every cent. If they agree to haul for somebody and they don't pay them, they want every cent. And see they get into it voluntarily. . . . These kids didn't agree to do this voluntarily. Their claim is more sacred than a contract claim. . . ."
A request that the jury put themselves in the place of the plaintiff, made as an appeal to the jurors' feelings and passion, *Page 1323 
is improper argument. Estis Trucking Co. v. Hammond,387 So.2d 768 (Ala. 1980). But see Fountain v. Phillips, 439 So.2d 59
(Ala. 1983), and Atkins v. Drake, 437 So.2d 469 (Ala. 1983), finding no prejudice in closing remarks.
The context of the objected-to argument shows that it was an allegorical discussion of an imaginary family delivered to illustrate a point about damages. While the particular remark, "Would you take five million dollars?" has the appearance, at least in a printed record, of verging on an appeal to the sympathy of the jury, defendants did not object on this ground at trial. The objections never mentioned an appeal to the sympathy of the jury, but only stated that what "a person" would take in advance of an accident was not a proper measure of damages. When an objection is made on specific grounds, other grounds may not be raised on appeal. Stephens v. Centralof Georgia R. Co., 367 So.2d 192 (Ala. 1978), and cases cited therein.
Defendants further argue that plaintiffs' counsel improperly told the jury not to worry about awarding too large a verdict because the trial court or this Court would reduce the verdict if it was too large. The transcript reveals that the following took place:
 "Mr. Rosser: One last thing, I don't want you to worry about your verdict for punitive damages being too big. If you decide that in order to get the attention of the Osborne corporation you've got to return a verdict of punitive damages of one million dollars or whatever, of course, Tommy has only asked for two hundred and fifty thousand, whatever your verdict is, if some of you should say that's too much, it's unfair, the judge has the authority and I assure you will reduce it if it's too much and if she doesn't the Supreme Court of Alabama will reduce it. What we're asking you for is your opinion —
 "Mr. Young: Your Honor, just a minute, Mr. Rosser, we have got to object to Mr. Rosser arguing to the jury that they should award a verdict without respect of what is a reasonable verdict because if it's too much that the Supreme Court or you will have something to say about it at that time. It's an illegal argument to ask them to give a large verdict on the assumption that you or someone else would have an overview of it and that should be the basis of the award of damages, that is not the measure of damages, Your Honor.
 "By the Court: Let me say this, ladies and gentlemen of the jury, your verdict must be based upon the evidence and the law in this case. That's the instruction I've given you throughout this case and that's the instruction I'm going to give you in a little while after lunch break, but your verdict in this case, as in any other case, must be based upon the evidence that you've heard in this case and the law as I give to you in this case."
This instruction adequately cured any prejudice created by counsel's remarks, and defendants requested no further action. There was no error to reversal here.
Defendants next take issue with the fact that plaintiffs' counsel stated to the jury, "You didn't hear his driving record; we couldn't get that in over his objection." Here again, the court sustained the objection and instructed the jury to disregard the remark. Moreover, defendants' counsel had opened the matter up, and the fact that this remark was reply-in-kind is manifest from the statement just prior to the one quoted: "[Cartee has been a] professional driver for sixteen years, who Mr. Young says has a perfect driving record." Here again, there is nothing to review and no reversible error.
As their final assertion of prejudicial remarks during closing argument, defendants cite the following: "Just a slight — you put all our evidence on this side and their evidence on this side and all we've got to do is tip the scale just a little bit and we win. . . ." The trial court overruled defendants' objection that this argument misstated the burden of proof. This *Page 1324 
statement was merely an illustration of the concept of the burden of proof, implying that the preponderance of the evidence must balance in favor of the plaintiffs, which is the correct standard.
Defendants also argue that the trial court erred in allowing plaintiffs, in connection with their closing arguments, to display charts itemizing damages for Reba and Sonny, including future medical expenses and lost earning capacity. The evidence showed that Sonny suffered a slight permanent loss of motion in one ankle with the possibility that he might develop osteoarthritis in that ankle. His doctor testified that he would not need further treatment, other than aspirin for pain, and would be able to work normally unless he developed the osteoarthritis. Reba's injuries were more serious, possibly requiring further surgery to increase flexion in one knee and to reduce the scar on her neck. Even with further surgery on the knee she would have a permanent loss of ability to fully bend the knee.
When defendants objected to the use of the charts, which included specific figures for future medical expenses and lost earning capacity, the trial court instructed the jury:
 "I want to tell you that the attorneys on both sides have a right and a duty to argue to you the evidence and their inferences from the evidence at the end of the case, which is what we're doing right now. However, I do want to instruct you, ladies and gentlemen of the jury, that what attorneys say to you during a trial is not evidence and you should disregard anything that is not supported by the evidence or by the law as it is given to you by the Court."
This instruction cured any prejudicial effect which might have arisen by virtue of the fact that the charts included figures greater than what the evidence would support.
 Federal Motor Carrier Safety Regulations
The court, in instructing the jury, read portions of the Federal Motor Carrier Safety Regulations, which plaintiffs alleged and offered proof that Cartee had violated with Osborne's knowledge and approval. Defendants argue that the manner in which the court read these regulations in conjunction with the Alabama rules of the road could have misled the jury into believing that violation of the federal regulations constituted negligence per se.
The trial judge did not literally read the federal regulations as part of the Alabama rules of the road. The judge introduced a series of charges with the words, "I further charge you, ladies and gentlemen of the jury," prior to and after the charges in question. The charges on which defendants predicate error are as follows:
 "I further charge you, ladies and gentlemen of the jury, that in Alabama we have certain statutes called the rules of the road. The Alabama rules of the road consist of a number of statutes enacted into law by your legislature regulating the flow of traffic upon the highways of this state. The violation of certain of these rules of the road by persons using the public highways is negligence as a matter of law. Such negligence, however, in order to be actionable on the part of the Plaintiff or a defense on the part of Defendants must proximately cause or proximately contribute to the injury complained of by the Plaintiff. I will now read to you certain of these rules of the road the violation of which is negligence as a matter of law. The fact that I read these statutes is no indication that any of these statutes has been violated or that any such violation proximately caused or proximately contributed to the injury complained of by the Plaintiffs. It is for you to decide whether or not any such violation proximately caused or proximately contributed to the injury complained of by the Plaintiffs depending on what you find the facts to be. Code of Alabama Section 32-5a-111 reads as follows: the driver of a vehicle intending to turn to the left within an intersection into an alley, private road, or a driveway, shall yield the right-of-way to any vehicle approaching from the opposite direction, *Page 1325 
which is within the intersection or so close thereto as to constitute an immediate hazard.
 "I further charge you members of the jury, that the Federal Motor Carrier Safety Regulations in effect at the time of the occasions complained of reads [sic] as follows, Section 392.3: No driver shall operate a motor vehicle and a motor carrier shall not require or permit a driver to operate a motor vehicle while the driver's ability or alertness is so impaired or so likely to become impaired through fatigue, illness or any other cause as to make it unsafe for him to begin or continue to operate the motor vehicle. Section 390.32 reads: whenever in parts 390 to 397 of this subchapter a duty is prescribed for a driver or a prohibition is imposed upon him, it shall be the duty of the motor carrier to require observance of such prescription or such prohibition and if the motor carrier is himself a driver he shall likewise be bound thereby. Section 395.3 reads: no motor carrier shall permit or require any driver used by it to drive, nor shall any such driver drive more than ten hours following eight consecutive hours off duty or drive for any period after having been on duty fifteen hours following eight consecutive off duty."
These regulations were admitted into evidence and the one last quoted was the subject of much discussion during trial. Plaintiffs sought to prove that Cartee, with the approval of his dispatcher, had driven for twelve and a half hours on the day of the accident, and Cartee's own testimony showed that he first went on duty more than sixteen hours before the accident happened.
Defendants' objections to the court's oral charge included, on this point:
 "The Defendant further cites [as] error the inclusion of the regulations set forth in the Motor Vehicle Safety Act as part of the rules of the road —
"By the Court: I didn't.
"Miss Westbrook continues: It sounded like it.
"By the Court: O.K.
 "Miss Westbrook continues: — which constituted negligence per se.
 "Mr. Young: And that the violation of such regulation would constitute negligence per se.
 "Miss Westbrook continues: No explanation was given as to any effect of it.
"By the Court: O.K."
While it is true that the trial court read the federal regulations immediately after reading some of the Alabama rules of the road, the court did not in fact instruct that the regulations were part of the rules of the road or that violation would constitute negligence per se. The objections that it "sounded like" the regulations[1] were included with the rules of the road, and that no charge was given as to the effect of the regulations, were not sufficient to put the trial court in error.
The court properly instructed the jury that violation of the Alabama statutory rules of the road may constitute negligence per se and then read a pertinent statute complete with Alabama Code citation. The court then identified the federal regulations as such and proceeded to read several of them. The court committed no error in these actions.
Regarding the objection that no explanation was given as to the effect of the regulations, it was incumbent upon the defendants to make a more specific request in order for the trial court to be put in error. The Motor Carriers Act, under which the regulations were promulgated, imposed upon the Interstate Commerce Commission the duty to make such regulations for safe operation, including "qualifications and maximum hours of service of employees." 49 U.S.C. § 304 (a). Violation of the regulations carried criminal penalties. Id., *Page 1326 
§ 322 (a). Thus, the charge as read was an accurate statement of applicable law.
While it is true that Rule 51, A.R.Civ.P., dispensed with the requirement of submitting additional explanatory charges, see, e.g., Feazell v. Campbell, 358 So.2d 1017 (Ala. 1978), the trial court should not be put in error here, because the charge was otherwise correct and was not so incomplete as to mislead the jury. Cf. Odom v. Linsey, 365 So.2d 664 (Ala. 1978). Defendants made no suggestion as to what the effect of the regulations might be and so did not present the trial court with any indication as to how the instruction was incomplete. We note the holdings in Industrial Tile, Inc. v. Stewart,388 So.2d 171 (Ala. 1980), and Knight v. Burns, Kirkley WilliamsConstr. Co., 331 So.2d 651 (Ala. 1976), that OSHA standards were admissible regarding the standard of care to be followed. By analogy, an instruction that the jury could consider the Motor Carrier Safety Regulations in determining defendants' standard of care would have been appropriate. Defendants made no such request, however, and had not objected to the introduction of the regulations into evidence, so they cannot complain here that the trial court committed error.
 Wantonness
The trial court denied defendants' motion for a directed verdict on the wantonness count. The court based its ruling on Cartee's violation of the Motor Carrier Safety Regulations, and defendants argue that this was error. While we agree that the mere violation of these regulations would not support a claim of wantonness, cf. Tew v. Jones, 417 So.2d 146 (Ala. 1982), we decline to reverse the trial court's ruling because there was sufficient evidence of wantonness. Tommy Whitten testified that the truck turned in front of him without stopping or giving a signal. Cartee said that he turned on his left turn signal well before the turn, but admitted that he turned without stopping.
Cartee testified that he did not see the plaintiffs' vehicle, and defendants sought to prove that the plaintiffs did not have their lights on. The investigating officer testified that the headlight switch on the Volkswagen was in the "off" position when he examined it shortly after the accident. Plaintiffs' expert witness testified that he found a filament from the right headlight which had been burning when the accident occurred. Tommy testified that his headlights were on. The road was flat and straight along the plaintiffs' line of travel, so Cartee had an unobstructed view.
The above items of evidence are sufficient to show that the jury would have been entitled to disbelieve Cartee's testimony that he did not see the van or to find that he acted with such reckless disregard of the presence of other vehicles as to justify a finding of wantonness. The jury could also have found that Cartee was fatigued because of the inordinate length of time he had driven the truck and with knowledge of that fact continued to drive.
 "Before a party can be said to be guilty of wanton conduct, it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury. But knowledge need not be shown by direct proof. It may be made to appear, like any other fact, by showing circumstances from which the fact or actual knowledge is a legitimate inference."
Lankford v. Mong, 283 Ala. 24, 26, 214 So.2d 301 (1968) (citations omitted). See also Prescott v. Martin, 331 So.2d 240
(Ala. 1976); Sparks v. Milligan, 295 Ala. 358, 330 So.2d 417
(1976).
 Evidentiary Rulings
Defendants allege error in a number of rulings on admissibility of evidence. The first of these involves cross-examination of defendant Cartee on a criminal conviction: "Isn't it also true that you got fired from Courtland Paper Mill for stealing and that you were convicted for that?" The trial court sustained defendants' objection and instructed the jury to disregard the question: *Page 1327 
 "Ladies and gentlemen of the jury, I'm going to sustain the objection and I'm going to instruct you something that I've not instructed you before. I'm going to instruct you to disregard this last question completely. Now, you remember that I told you that the evidence comes from the witness stand; what the lawyers tell you is not evidence and I want to say this to you, you are to disregard this last question that was made by this lawyer. I also want to tell you this: when I tell you to disregard it, that means that you, even if you cannot erase it from your mind, you absolutely cannot take it into consideration. You absolutely cannot take it into consideration when you go into the jury room."
Outside the presence of the jury, defendants then moved for a mistrial. They argued that the district court conviction to which plaintiffs referred had been nol-prossed on appeal to circuit court. The court questioned Cartee, but he was unable to respond more definitely than to say he had been told the case had been thrown out. The court overruled the motion for mistrial, observing that it was not sure any error had been committed, since there was proof of the conviction but no proof of the result in circuit court, but "even if he was not convicted, I think it was cured when I told the jury to disregard the question."
A witness may be questioned about a conviction of a crime involving moral turpitude for purposes of impeachment. Code 1975, § 12-21-162 (b). Prosecutions which result in less than a conviction are not admissible. Wright v. State, 354 So.2d 838
(Ala.Crim.App. 1977), cert. denied, 354 So.2d 842 (Ala. 1978). The trial court sustained the objection to the question, however, and forcefully instructed the jury to ignore the question. Any error prejudicial to defendants was sufficiently cured, so there were no grounds for a mistrial. Wright v.State, supra.
Defendants next argue that the trial court erred in overruling questions posed to Cartee based on charts in a Rand-McNally atlas showing the distance and driving time between various points on his route. Defendants claim that the charts are hearsay and the atlas was not introduced into evidence. Rule 44 (g), A.R.Civ.P., adequately answers these contentions:
 "Historical works, books of science or art and published maps or charts, when made by persons indifferent between the parties, are prima facie evidence of facts of general notoriety and interest."
(Emphasis added.)
Cartee had testified as to his driving time on the day of the accident, denying that he had driven more than ten hours that day. He disagreed with the figures from the atlas about which he was questioned, but questions based on those figures were proper cross-examination.
Defendants next contend that the trial court erred in overruling objections to questions posed to Cartee about a prior accident. The record shows, however, that defendants' attorney told the jury in opening statement that "The evidence is going to be that this is the first wreck that he has ever had." Cartee answered a question on direct examination as follows:
 "Q. Did you make any observation or any determination as to whether or not he could get out of the van?
 "A. No sir, I did not, because, you know, I was scared, I had never had a [sic] accident or nothing like this and I knew he was hurt —
 "Mr. Self: Your Honor, at this time we want to point out to the Court that he opened the door."
After the court overruled the objections to the cross-examination about a prior accident, Cartee answered:
 "A. I never said I'd never had an accident of this sort —
"Mr. Rosser continues: What did you say?
 "A. — I mean never had a [sic] accident before, I said a [sic] accident where anyone was hurt and involved."
"Q. You turned a truck over one time didn't you?
"A. Yes sir. *Page 1328 
"Q. Freight truck?
"A. Yes sir.
"Q. Because you ran off the road?
 "A. I was going up a two-lane road and the shoulder was high on the road and the right front wheel fell off and it turned."
Defendants cite Gamble, McElroy's Alabama Evidence § 14.01 (3d ed. 1977), on the doctrine of "curative admissibility" and argue that none of the prerequisites were met for admission of the evidence of the prior accident. They point out that the remarks in opening statement were not evidence and that Cartee's answer in which he said he had not had a prior wreck was not responsive.
McElroy's cites Camp v. Dobson, 228 Ala. 32, 152 So. 38
(1934), for the proposition that an unresponsive answer to a proper question does not open the door for an opponent to introduce illegal evidence in rebuttal. The holding in Camp
rested in part on the fact that the answer "was a mere voluntary statement" and the contestant was "not to be held so highly responsible for the form of the answer given." Id.,228 Ala. at 35, 152 So. 38. The situation at bar is distinguishable, however, because of the prior statement to the jury that the evidence would show "that this is the first wreck that he has ever had." Plaintiffs' attorney only questioned Cartee to the extent of clarifying his testimony that he had not been in a wreck with injuries. No prejudicial error arose in this line of questioning. See Plenkers v. Chappelle,420 So.2d 41 (Ala. 1982); Wilkinson v. Duncan, 319 So.2d 253 (Ala. 1975).
Defendants next refer to an item in the testimony wherein one of Reba's doctors was allowed to comment on the report of another one of her doctors. The report had been admitted into evidence and the testimony from the stand was wholly insignificant as regards any element of the case. Any error was harmless. Rule 45, A.R.A.P.
The same holds true for the defendants' assignment of error in the overruling of objections to cross-examination of James McKay, a personnel and safety employee of Osborne. Plaintiffs asked McKay if he knew why the federal regulations prohibited driving more than ten hours or being on duty for more than fifteen hours per day. The questions called for yes or no answers. The trial court overruled objections to both questions, and McKay, instead of answering whether or not he knew the purpose, answered in a general and evasive way that "[t]he federal government puts the rules and regulations out and we [are] supposed to abide by them to the best of our ability," and after fifteen hours "then a man must have eight hours rest. . . ." The Federal Motor Carrier Safety Regulations had been admitted into evidence, and we see neither error nor prejudice to defendants from this exchange.
Defendants raise two allegations of error relating to questions they propounded to Ralph Cunningham, a witness defendants placed on the stand as an accident reconstruction expert. The first allegation involves questions seeking to qualify him as an expert. At the outset of his testimony he was asked about the information he gathered, and plaintiffs objected that he had not yet been qualified as an expert. Shortly thereafter, he was asked about the academic qualifications of the engineers for whom he worked, and plaintiffs objected that the questions called for hearsay. After these objections were sustained, defendants asked further detailed questions about Cunningham's background and then asked him questions about his reconstruction of the accident.
"Whether or not a particular witness will be allowed to testify as an expert is in the sound discretion of the trial court, whose decision will not be disturbed on appeal except for palpable abuse." Burroughs Corp. v. Hall Affiliates, Inc.,423 So.2d 1348, 1353 (Ala. 1982); Meadows v. Coca-ColaBottling, Inc., 392 So.2d 825 (Ala. 1981); Brown v. AAA WoodProducts, Inc., 380 So.2d 784 (Ala. 1980). Here, the defendants do not even object to the refusal to allow a witness to testify as an *Page 1329 
expert, but only to the manner in which he was allowed to be qualified. We find no abuse of discretion by the trial court in these rulings.
The second allegation of error in connection with Cunningham's testimony regards questions asked him about his reconstruction of the accident. He went to the scene of the accident and observed Cartee turning in a manner similar to the turn which occasioned the accident. Cunningham timed the truck from the time the front wheels crossed the center line into the oncoming lanes until it reached the point of impact, a distance of about eighty feet. On four turns, he clocked times of 4.13 seconds, 4.42 seconds, 6.20 seconds, and 4.94 seconds. He testified that to travel the distance in 4.13 seconds, the truck would be going thirteen miles per hour.
In earlier testimony, Cunningham testified that he estimated the truck traveled twelve and a half feet after impact. He had also said that the average reaction time for a person to put on brakes after an impact is three-quarters of a second, and in that three-quarters of a second the truck would have traveled 22 feet at twenty miles per hour, 11 feet at ten miles per hour, or 5 1/2 feet at five miles per hour.
The question to which objection was sustained came immediately after Cunningham testified that the truck would be traveling at thirteen miles per hour to reach the point of impact in 4.13 seconds after beginning the turn:
 "Q. And if the truck was traveling thirteen miles an hour at the point of impact, how far would it travel . . . during three-quarters of a second?
 "Mr. Rosser: At this point we object, because the evidence is that the point of impact locked up the trailer so that it would not roll.
"By the Court: I'm going to sustain the objection.
 "Mr. Young: Your Honor, please we take exception to the objection in that it did not say that it locked up the trailer.
". . . .
 "Mr. Young continues: How many feet will a vehicle move at thirteen miles an hour in three-quarters of a second?
 "Mr. Self: I object to that, may it please the Court, it has no relevancy. The relevancy is what happened on that day and the trailer wheels were locked up then, I don't think —
"By the Court: Sustained."
Defendants assert that the sustaining of these objections was error because they had the right to pose a hypothetical question to their expert predicated on such facts as conformed to the theory they were trying to establish — i.e., that Cartee made the turn slowly because the truck only traveled 12 1/2 feet after impact, and thus Tommy Whitten should have had time to avoid the impact. They cite Lehigh Portland CementCompany v. Dobbins, 282 Ala. 513, 213 So.2d 246 (1968), as authority for the right of an examiner to pose a hypothetical question on such facts in evidence as he sees fit, and state that plaintiffs' proper action was to cross-examine the witness using their version of the facts.
Plaintiffs counter that defendants' citation of LehighPortland Cement Co. omits a critical qualification of the rule. The pertinent portion of that opinion reads:
 "A hypothetical question is not objectionable because it omits to hypothesize every fact shown by the evidence, for an examiner of an expert witness may lay as a basis for the opinion invited only those facts in evidence which conform to the theory the examiner would establish, though, of course, such question should incorporate sufficient facts in evidence to fairly justify the formation of an expert opinion on a material issue in the case; the frame and substance of hypothetical questions to expert witnesses being a matter largely committed to the discretion of the trial court. (Citing cases) Sovereign Camp, W.O.W. Davis, 242 Ala. 235, 5 So.2d 480."
Id., 282 Ala. at 516, 213 So.2d 246 (emphasis as added by plaintiffs).
The testimony that the trailer wheels were so damaged by the impact *Page 1330 
that they would not turn came from Cartee himself in his deposition. That being admitted by defendants, the hypothetical questions indeed omitted a crucial fact. While there is some merit to defendants' position that, had the questions been allowed, plaintiffs could have asked a similar question including the effect of the locked trailer wheels, this argument at most indicates that it might not have been an abuse of discretion for the trial court to overrule the objection. Because, however, the omission of a material fact provided a ground on which the question was objectionable, the trial court did not abuse its discretion in sustaining the objections.
Finally, under their issue of erroneous evidentiary rulings, defendants argue that the cumulative effect of these rulings was prejudicial enough that the judgment should be reversed even if not on the basis of any one of them. These rulings are incidents selected from a trial lasting five days and producing a transcript over 600 pages long. In the context of the trial we cannot conclude that these incidents deprived defendants of a fair trial.
 Contributory Negligence
The trial court directed a verdict for Reba and Sonny on the defense of contributory negligence interposed against their claims. Defendants argue that it was error to direct a verdict as to Sonny, because there was a scintilla of evidence that he was driving. Plaintiffs, however, point out that the agreed summary in the pre-trial order referred to "a 1966 van being operated by Tommy Whitten and in which Reba Mae Langston and James Samuel Langston III were passengers. . . ." The defendants' motion to consolidate the cases for trial similarly referred to "a vehicle being driven by Tommy Whitten."
Agreements and stipulations made in a pre-trial order are binding on the parties and control the subsequent course of the action. Watson v. McGee, 348 So.2d 461 (Ala. 1977); Rule 16, A.R.Civ.P. Defendants argue that the issue of whether Sonny was driving was tried by implied consent, see Rule 15 (b), but the evidence they cite mainly describes the positions of Sonny and Tommy after the wreck. This was sufficiently within the proof of the issues properly before the court that we cannot say Rule 15 (b) overrode the admissions in the pre-trial order. The trial court did not err in directing a verdict on the defense of contributory negligence of Sonny Langston.
 Excessiveness of the Verdicts
Defendants argue that the verdicts were excessive and were a product of bias and prejudice. They point out that Reba and Sonny each had medical expenses of just over $22,000.00.
The evidence, however, would support substantial damages for pain and suffering, disfigurement, mental anguish, and physical disability. Reba had had six operations by the time of trial; Sonny had had five. They had both spent forty days in body casts and over two months in the hospital. Reba had a permanent disfiguring scar on her neck and they both had permanent impairments, Reba to her knee and Sonny to his ankle. These injuries would support large jury verdicts even without the possibility of punitive damages.
The evidence would also support punitive damages either on the theory that Cartee wantonly turned in front of the plaintiffs or on the indication that Osborne instructed Cartee to drive beyond the Federal driving time limitations and he did so. Indeed, Osborne's dispatcher told Cartee to drive out and pick up another load at a time when he was already past the fifteen-hour on-duty limit and apparently also the ten-hour driving limit. While the violation of these regulations is not conclusive evidence that Cartee was tired and inattentive, it is evidence of intentional wrongdoing, which would support punitive damages.
Our conclusion that the verdicts are not so high as to necessitate a reversal is bolstered by the fact that the verdict was only $56,000.00 for Tommy Whitten, whose injuries were far less serious. This indicates that the jury awarded a great portion of *Page 1331 
the damages in favor of Sonny and Reba for their injuries and suffering, not as a result of bias against the defendants.
For the reasons stated, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
FAULKNER, JONES, SHORES and EMBRY, JJ., concur.
[1] Although defense counsel referred to the "Motor Vehicle Safety Act" in their objection, the trial court appears to have understood that the reference was to the Motor Carrier Safety Regulations.