The plaintiffs, Kirkland Company of Anniston, P.C.; Kirkland Co. of Birmingham, P.C.; and Kirkland Co. of Gadsden, P.C. (collectively referred to hereinafter as "Kirkland"), appeal from a jury verdict in favor of A M Food Service, Inc., Alexander Sexton, Michael Sexton, and Janice Sexton.
On November 26, 1975, Charles T. Sweeney and Jean Sweeney, owners of land in Anniston, Alabama, and Fred Pierson and Harold Griffin executed a lease agreement. Pursuant to the terms of the agreement, the Sweeneys constructed a building on their property in accordance with agreed-to specifications and leased the land and the building to Pierson and Griffin, who intended to operate a pizza business. The term of the lease was 15 years, and, at the end of the 15-year term, the lessees had the option to renew the lease for two five-year terms. The lease provides, in pertinent part:
 "1. . . . Rent shall be pro-rated for the first month and thereafter rent shall be payable in advance on the first day of each month.
". . . .
 "4. . . . The rental herein reserved shall be payable monthly, in advance at the office of the Landlord, or at such other place as Landlord may designate in writing to Tenant, and all such rentals shall be payable when due without any prior demand.
". . . .
 "10. If the Tenant shall at any time be in default in the payment of the rent or additional rent or any other payments required of Tenant hereunder, or any part thereof, or if Tenant shall be in default in any of the other covenants and conditions of this lease to be kept, observed and performed by Tenant, or if this leasehold interest shall be levied on or taken or attempted to be taken on execution, attachment or other process of law, or if any property in the demised premises, whereby the demised premises shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant, of [sic] if a receiver, assignee or trustee shall be appointed for Tenant's property, or if this lease shall by operation of law (other than by devise, bequest and descent, and by reorganization into some other entity, such as a corporation, and by proper assignment or sublease as hereinafter provided) devolve upon or pass to any person or persons *Page 1280 
other than the Tenant, then in any of said cases, the Landlord may:
". . . .
 "(b) At its option, at once, without notice to Tenant, or to any other person, terminate this lease and re-enter premises.
". . . .
 "(f) Declare the entire rental for the balance of the term, immediately due and payable at once.
". . . .
 "16. The failure of either party to insist upon a strict performance of any of the terms, conditions and covenants herein shall not be deemed to be a waiver of any rights or remedies that either party may have and shall not be deemed a waiver of any subsequent breach or default in the terms, conditions and covenants herein contained except as may be expressly waived in writing. In the event it becomes necessary for Landlord or its assigns to employ attorneys at law in or about the collection of rent or enforcement of other covenants under this lease agreement, the Tenant herein agrees that it will pay to the Landlord or its assigns, as the case may be, the reasonable attorney's fee incurred thereby.
". . . .
 "20. This lease contains all the agreement between the Parties hereto and may not be modified in any manner other than by agreement in writing signed by all the parties hereto or their successors in interest."
On July 7, 1977, the Sweeneys sold the property and assigned their interest in the lease to Kirkland, which had obtained a bank loan in order to finance the purchase of the property. Pierson and Griffin made monthly rental payments directly to the bank, which credited Kirkland with the payment. George Smith, an employee of, and a stockholder in, Kirkland Company of Anniston, testified that Kirkland depended on the lessees' monthly payments in order to pay its debt on the note to the bank.
On March 12, 1986, Kirkland acquiesced to Pierson and Griffin's subletting the property to A M, pursuant to a provision in the lease agreement. The assignment agreement provided that Pierson and Griffin remained obligated under the terms of the lease agreement and that A M would "be governed by all terms of the original lease." It further provided that, on the closing date of the assignment agreement, A M would provide hazard insurance, naming Kirkland as the loss-payee for no less than the appraised value of the building, that A M would pay all real estate and ad valorem taxes, and that, on the date of the closing, A M would pay the first and the last month's rent. Kirkland's acquiescence to the assignment agreement was also based on the personal guarantees of Alexander Sexton, Michael Sexton, and Janice Sexton, who were officers of A M.
On the date the assignment agreement was executed, A M wrote checks in the following amounts and for the following purposes: $1,150 for both its portion and Pierson and Griffin's portion of rent for March 1986; $4,954.77 for ad valorem taxes owed previously by Pierson and Griffin; $463. 19 for ad valorem taxes;[1] $1,150 for advance rent;[2] and $615.40 for casualty insurance for the rental property.
On April 4, 1986, A M paid $1,150 rent directly to the bank for the month of April. Kirkland accepted the payment.
On April 8, 1986, Kirkland deposited with its bank A M's check for $4,954.77 for ad valorem taxes. Due to insufficient funds, *Page 1281 
the check was returned to Kirkland on April 11, 1986. On April 23, 1986, counsel for Kirkland sent, and on May 2, 1986, A M received, a certified letter in which Kirkland stated that, because A M had not paid the ad valorem taxes, it was invoking all remedies available to it pursuant to the lease agreement, including termination of the lease and acceleration of the rental payments, and was requiring immediate payment of the outstanding ad valorem taxes and attorney fees. On May 5, 1986, Alexander Sexton delivered a cashier's check to Stanley Nelson, an employee of, and a stockholder in, Kirkland 
Company of Anniston, for the entire amount of the outstanding ad valorem taxes. Nelson accepted the payment. Nelson testified that when Sexton delivered the cashier's check, he told Sexton that rental payments should be made in a timely fashion. Sexton testified that no such remark was made at that time.
Both Alexander Sexton and Dr. K.K. Verma, who had previously sold a franchise in his pizza business to A M in return for 5% of the gross profits of the business, testified that Sexton discussed the possibility of selling the franchise in Anniston back to Dr. Verma. Dr. Verma told Sexton that he would not be willing to purchase the business unless he could assume the lease of the property owned by Kirkland. Sexton said that at some time on or after he delivered the check to Nelson, Sexton said he mentioned to Nelson that A M was negotiating to sublet the property. He said Nelson told him that Kirkland would prefer to sell the property rather than approve a sublease. There was evidence presented that Dr. Verma contacted Nelson about subletting the Kirkland property and that Nelson told Dr. Verma that Kirkland would prefer to sell the property. Nelson denied that that conversation took place.
Nelson testified that, at some time in May 1986, the bank informed Kirkland that it had not received a complete payment on the note for that month.[3] Nelson said that he instructed the bank not to accept A M's check when it arrived. Thereafter, the bank received a check from A M for $1,150, the amount due for rent in May 1986; the check was dated May 15, 1986. Nelson testified that the check was received by the bank on May 30, 1986.
On June 3, 1986, counsel for Kirkland notified Pierson, Griffin, A M, and the Sextons that, because A M had not made timely payment for the May rent, A M was in default and Kirkland was terminating the lease pursuant to the lease agreement and was demanding payment for the balance of the term of the lease. A M ceased its business operations, vacated the premises, and Kirkland took possession of the property.
Kirkland filed a complaint against A M, the Sextons, Pierson and Griffin, alleging that because A M's May 1, 1986, lease payment had been received on May 30, 1986, it had, pursuant to the terms of the lease, terminated the lease and accelerated the payment from the defendants of the balance due under the lease; and it sought $69,000 as the balance accelerated, and attorney fees. The defendants filed motions to dismiss the complaint for failure to state a claim upon which relief could be granted; the motions were denied. Pierson and Griffin filed a cross-claim against co-defendants A M and the Sextons, alleging that those co-defendants were liable to Pierson and Griffin for the entire amount of any judgment awarded to Kirkland and against Pierson and Griffin. Co-defendants A M and the Sextons, filed an answer to the complaint, denying Kirkland's allegations, raising several defenses, and demanding a jury trial. They also filed a two-count counterclaim. In count one of the counterclaim, they alleged that Kirkland had maliciously, wantonly, or intentionally terminated the lease without legal cause; in count two, they alleged a negligent termination of the lease without legal cause. They demanded damages for a loss of profits from an ongoing business. In an amendment to their counterclaim, A M and the Sextons added a third count, alleging *Page 1282 
that Kirkland had wrongfully and without just legal cause refused to allow the defendants to sublet the property or to assign the lease. Following a claimed mitigation of damages by a sale of the land, Kirkland amended its complaint, reducing its demand for damages from $69,000 to $9,000.
The case was tried before a jury. At the conclusion of all the evidence, Kirkland moved for a directed verdict on its complaint and on all counts in the counterclaim. The motion was denied. The jury returned a verdict in favor of Pierson and Griffin on their cross-claim against A M and the Sextons, in the amount of $2,000. (See note 6, infra.) The jury returned a verdict in favor of A M and the Sextons on their counterclaim against Kirkland, in the amount of $202,000. The trial court entered judgment on the verdicts. Kirkland moved for a judgment notwithstanding the verdict, or, alternatively, for a new trial or for a remittitur. The motion was denied. Kirkland appeals from the judgment entered in favor of A M and the Sextons on Kirkland's claim and on A M's and the Sextons' counterclaim.
 I.
In count one of its complaint, Kirkland alleged that it had the contractual right to terminate the lease and to demand the balance of the rental money owed under the lease. In counts one and two of their counterclaim, A M and the Sextons alleged that Kirkland had negligently, wantonly, maliciously or intentionally terminated the lease without legal cause. Kirkland argues that all of these claims are based on an alleged breach of contact, and that the trial court erred in refusing to direct a verdict for Kirkland on these claims because, it argues, the nonwaiver and nonmodification clauses in the lease are strictly enforceable. We agree that each of these claims are based on an alleged breach of the contract. However, we do not reach the issue of whether the nonwaiver and nonmodification clauses are strictly enforceable in this case, because we hold that the lease was ambiguous as to the time when payment was due. Because the contract was ambiguous, a fact question existed as to whether the rental payment was due on the first of the month, and, therefore, the trial court properly submitted the claims to the jury.
Whether a contract is ambiguous is a question of law for a trial court to determine. Cherokee Farms, Inc. v. Fireman'sFund Insurance Co., 526 So.2d 871 (Ala. 1988); P S Business,Inc. v. South Central Bell Telephone Co., 466 So.2d 928
(Ala. 1985). Only if the contract is found to be ambiguous will the issue of its meaning be sent to the jury for its determination. Elder v. E.I. DuPont De Nemours Co.,479 So.2d 1243 (Ala. 1985).
In this case, the lease provided the following concerning the time for payment of rent:
 "1. . . . Rent shall be pro-rated for the first month and thereafter rent shall be payable in advance on the first day of each month.
". . . .
 "4. . . . The rental herein reserved shall be payable monthly, in advance at the office of the Landlord, or at such other place as Landlord may designate in writing to Tenant, and all such rentals shall be payable when due without any prior demand."
Paragraph one unambiguously states that rent was due to be paid to Kirkland on the first day of each month. Had the lease contained nothing more concerning the time when payment was due, no ambiguity would exist. However, paragraph four provides only that the rent was "payable monthly, in advance." It is not certain from a reading of this phrase that the rent was due on the first of the month. We conclude that the contract is ambiguous and is susceptible of more than one meaning and that, therefore, the issue of its meaning was properly submitted to the jury for its determination. Therefore, we hold that the trial court properly submitted Kirkland's claim and counts one and two of A M and the Sexton's counterclaim to the jury. *Page 1283 
 II.
Kirkland next argues that, as to count three of A M and the Sextons' counterclaim, the trial judge erred in failing to grant its motion for judgment notwithstanding the verdict, or, alternatively, its motion for a new trial.
In count three of their counterclaim, A M and the Sextons claimed that Kirkland had wrongfully refused to allow A M to sublet the property or to assign the lease. Kirkland argues that, because A M and the Sextons presented no evidence that they had a firm sublease proposal before they defaulted on the terms of the lease, Kirkland was entitled to a directed verdict on count three. A M and the Sextons present several arguments, including the argument that Kirkland's motion for directed verdict was not specific as to count three and that, therefore, Kirkland waived its right to challenge that count. We agree. In Aspinwall v. Gowens, 405 So.2d 134 (Ala. 1981), this Court stated:
 "[I]f a complaint has more than one count and the Defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict, specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count."
405 So.2d at 138. After a careful review of the record, we hold that because Kirkland did not, in its motion for directed verdict, argue with the requisite specificity that count three of the counterclaim was not supported by the evidence, Kirkland did not preserve error as to that count. As we must, we assume that the verdict, which was a general verdict, was based on a valid count.
Kirkland argues, alternatively, that it is entitled to a new trial on the ground that the trial court abused its discretion in allowing Dr. Verma to testify, because, it alleges, A M and the Sextons never notified Kirkland that they were going to call Dr. Verma as a witness, as was required by the pre-trial order.
The rules regarding pre-trial orders are well settled in Alabama. Agreements made in a pre-trial order are binding on the parties, and the order controls the subsequent course of the action. Rule 16, A.R.Civ.P.; Osborne Truck Lines, Inc. v.Langston, 454 So.2d 1317 (Ala. 1984); Electrolux Motor AB v.Chancellor, 486 So.2d 414 (Ala. 1986). A trial judge has discretion to amend a pre-trial order, and his decision will not be reversed on appeal unless there has been a clear abuse of discretion. Hughes v. Arlando's Style Shop, 399 So.2d 830
(Ala. 1981); Electrolux Motor AB v. Chancellor, supra.
Kirkland cites Deaton, Inc. v. Burroughs, 456 So.2d 771
(Ala. 1984), and Electrolux Motor AB v. Chancellor, supra, in support of its position that the trial court abused its discretion in this matter. In Deaton, Inc. v. Burroughs, supra, this Court upheld the trial court's ruling that a partial exclusion of an expert witness's testimony under Rule 37, A.R.Civ.P., was a fair compromise. In that case, defense counsel had admitted that it never formally answered the plaintiff's interrogatories requesting the name of any expert witness that it planned to call at trial. Defense counsel had contended, however, that, three months before trial, he had informed plaintiff's counsel of the identity of his expert witness. Plaintiff's counsel had stated that he had no recollection of that disclosure.
In Electrolux Motor AB v. Chancellor, supra, the trial court ordered that, prior to trial, the parties submit a witness list to the other parties. At trial, Electrolux called an expert witness to testify, and Chancellor's counsel objected on the grounds that he had not received a witness list from Electrolux as required by the pretrial order. The trial court, after a hearing, sustained the objection. On appeal, Electrolux argued that it had drafted a list and had hand delivered it to Chancellor. Chancellor denied receiving it. Citing *Page 1284 Deaton, Inc. v. Burroughs, supra, we held that the trial court could have concluded that Chancellor had no knowledge that the expert witness would be called to testify at trial, and that the trial court did not abuse its discretion in refusing to allow the expert witness to testify.
In this case, the pretrial order stated, in pertinent part:
 "Upon a case being called for trial, each party shall provide the court and each opposing party a list of witnesses expected to be called to testify during such party's case-in-chief. Failure to comply with the requirements of this paragraph shall result in the court refusing to allow the testimony of any undisclosed witness. This paragraph does not apply to rebuttal witnesses who are called only as such, nor does it require a disclosure of the expected calling of a party by another as [a] Rule 43(b) witness. This paragraph is intended to allow all parties sufficient identity of potential witnesses to conduct meaningful voir dire of the jury panel. The sanctions imposed for non-compliance will not be waived unless to prevent manifest injustice."[4]
At trial, counsel for A M and the Sextons called Dr. Verma to testify, and Kirkland's counsel objected on the ground that he had not been presented with a witness list as required in the pre-trial order.[5] Counsel for A M and the Sextons conceded that he had not given Kirkland's counsel a witness list; however, he stated that at the time he deposed Alexander Sexton he told Kirkland's counsel that he planned to call Dr. Verma as a witness and that he asked him if he wanted to depose Dr. Verma. Although counsel for Kirkland could not deny that such a statement was made, he said he did not recall it.
This case is distinguishable from Deaton and Electrolux in that here the trial court allowed the witnesses to testify. Statements made by the respective parties' attorneys on this issue were conflicting. The trial court concluded that counsel for A M and the Sextons had told Kirkland's counsel that he was going to call Dr. Verma as a witness. We find that the trial court could have concluded as it did. Therefore, the trial court did not abuse its discretion.
 III.
Kirkland next argues that the trial court's charge to the jury was confusing and prejudicial and that, therefore, it is entitled to a new trial. Specifically, Kirkland argues that the trial court erred in soliciting objections to the jury charge in the presence of the jury and that the court's charge was contradictory and, therefore, misled the jury.
Rule 51, A.R.Civ.P., states that "[o]pportunity shall be given to make the objection [to the jury charge] out of the hearing of the jury." The following took place in the presence of the jury:
 "That concludes my oral charges to the jury. What say the plaintiffs?
"MR. RICE: Satisfied, Your Honor.
"THE COURT: What say the defendants?
 "MR. LANE: Satisfied, Your Honor, except for our earlier discussion concerning punitive damages.
"THE COURT: Subject to that, you are satisfied?
"MR. LANE: Yes, sir.
"THE COURT: What say the other defendants?
"MR. WOODROW: Satisfied, Your Honor."
Kirkland argues that it was denied an opportunity to object to the jury charge outside the presence of the jury. We disagree. *Page 1285 
In McLendon Pools, Inc. v. Bush, 414 So.2d 92
(Ala.Civ.App. 1982), the Court of Civil Appeals stated:
 "As we read Rule 51, A.R.C.P., the onus for objection is upon counsel. The rule does not require the court to initiate the opportunity to object, only that opportunity be given to make the objection out of the hearing of the jury. We conclude that if counsel fails to request the opportunity to object, the court will not be in error for not affirmatively offering it."
414 So.2d at 95. In that case, it appeared that the oral charge was completed and that the jury was directed to retire. The trial court did not follow the usual procedure of asking counsel if they objected to the charge; however, the Court of Civil Appeals stated that the record did not reflect that counsel stated an objection or requested an opportunity to do so. The court held that the trial court did not err.
We find the analysis in McLendon instructive. In this case, the trial court asked counsel for Kirkland for a reaction to the oral charge, and counsel replied, "Satisfied, Your Honor." Counsel for Kirkland did not, at that juncture, object to the charge or request an opportunity to do so outside the presence of the jury. Because Kirkland's counsel failed to request an opportunity to object, the trial court will not be held in error for failing to offer the opportunity. Cf. Cann v. FordMotor Co., 658 F.2d 54 (2d Cir. 1981) (counsel requested opportunity to make objections outside presence of jury, trial court refused, and appellate court held that counsel's failure to object was excused and that objections to jury instructions could be raised on appeal).
 IV.
Kirkland next argues that the jury verdict awarding $202,000 in damages to A M and the Sextons is not supported by the evidence. It contends that if the damages award was based on a wrongful termination of the lease, then it was based on speculation, and that, if the award was based on the refusal to allow A M to sublease the property, then it was excessive. Because we find that the first contention is without merit, we pretermit discussion of the second contention.
Lost profits are recoverable where it reasonably appears that they would have been made if the contract had been performed and where it appears that their loss necessarily followed the breach. Paris v. Buckner Feed Mill, Inc., 279 Ala. 148,182 So.2d 880 (1966). In determining the value of a lease, evidence of probable lost profits, although not necessarily accepted as a basis for recovery of lost profits, may be admissible as evidence from which a jury may draw a conclusion as to the value of a lease. Johnson v. Kersh, 395 So.2d 1011
(Ala.Civ.App. 1980), cert. denied, 395 So.2d 1014 (Ala. 1981). In Alabama, anticipated profits of an unestablished business may be recovered if such damages are proved with "reasonable certainty." Super Valu Stores, Inc. v. Peterson, 506 So.2d 317
(Ala. 1987); Morgan v. South Central Bell Telephone Co.,466 So.2d 107 (Ala. 1985). In Morgan, supra, this Court confirmed that the "reasonable certainty" standard for proving profits of an unestablished business prevails in Alabama:
 "The rule in Alabama concerning proof of lost profits was set forth in Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149, 182 So.2d 880, 881
(1966), by Justice Simpson:
 '. . . In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required.'
 This general rule is applied in most states, and is referred to as the rule of 'reasonable certainty.' The United States Supreme Court, in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, *Page 1286 75 L.Ed. 544 (1931), stated that this rule precludes only those damages not resulting from the wrong, allowing damages stemming from the wrong but uncertain in amount.
 "In essence, the rule dictates that recovery will ensue despite the fact damages cannot be calculated with mathematical certainty or without difficulty where they are clearly proximately caused by the wrong."
466 So.2d at 115-16. (Emphasis added in Morgan). See Super ValuStores, supra. Thus, verdicts awarding lost profits will be affirmed if the claimant provides a "basis from which the jury could, with reasonable certainty, calculate the amount of profits which were lost as a result of [the wrongdoer's actions]." Morgan, supra, at 116 (emphasis in original); SuperValu Stores, supra, at 327.
In Super Valu Stores, this Court reviewed the application of the "reasonable certainty" standard in other jurisdictions:
 "In Lee v. Seagram Sons, Inc., 552 F.2d 447, 455 (2d Cir. 1977), the court affirmed a verdict for lost profits that would have been earned from a liquor distributorship that defendant had agreed to provide plaintiff. Although the business was completely unestablished, the court held that profits had been established with reasonable certainty through expert testimony projecting profits over ten years, which was the 'assumed' life of this type of business. The court rejected defense arguments that this proof was speculative:
 'Mere dispute on the validity of some of the figures cannot wipe out the evidence but merely emphasizes that the jury was presented with a factual question whose determination we should not change.'
Lee v. Seagram Sons, Inc., at 456.
 "In Chung v. Kaonohi Center Co., 62 Haw. 594, 618 P.2d 283 (1980), the court affirmed a lost profits recovery for a restaurant that never commenced operations because of defendants' breach of an agreement to lease mall space. Plaintiff's expert testimony involved a one-day 'survey' of a comparable business's sales, industry averages, and projections of profits over the ten-year lease. In holding that the plaintiff satisfied the 'reasonable certainty' standard for proving lost profits for its unestablished business, the court explained:
 '[I]t would be grossly unfair to deny a plaintiff meaningful recovery for lack of a sufficient "track record" where the plaintiff has been prevented from establishing such a record by defendant's actions. Thus, we hold that where a plaintiff can show future profits in a new or unestablished business with reasonable certainty damages for loss of such profits may be awarded.'
62 Hawaii at 605, 618 P.2d at 291.
 "In Welch v. United States Bancorp Realty Mortgage Trust Co., 286 Or. 673, 596 P.2d 947
(1979), the court allowed a recovery for lost profits by an unestablished business:
 'Loss of profits will not be denied even though plaintiff does not rely on a past history of profitable operations if they are established by other factual data to a reasonable certainty.'
 286 Or. at 704, 596 P.2d at 963 (citations omitted). The court noted that expert testimony regarding plaintiff's anticipated return in future years from a complex real estate development venture was all that could be expected in the circumstances of this case. 286 Or. at 705, 596 P.2d at 964. To require more 'would be tantamount to holding that the defendant could breach this particular contract with impunity.' 286 Or. at 705, 596 P.2d at 964.
 "In Fera v. Village Plaza, Inc., 396 Mich. 639, 242 N.W.2d 372, 376 (1976), the court affirmed a lost profits verdict for an unestablished store because the anticipated profits were proven with reasonable certainty. The court observed that the verdict amount was well within the ranges of proof — plaintiff's proof of profits based on its expert's ten-year projections as opposed to defendant's proof of no profits.
 "As these cases demonstrate, the weight of modern authority does not *Page 1287 
predicate recovery of lost profits upon the artificial categorization of a business as 'unestablished,' 'existing,' or 'new,' particularly where the defendant itself has wrongfully prevented the business from coming into existence and generating a track record of profits. Instead, the courts focus on whether the plaintiff has adduced evidence that provides a basis from which the jury could with 'reasonable certainty' calculate the amount of lost profits. As held in Fera and Chung, the risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages."
506 So.2d at 329-30.
In Morgan, the plaintiffs, who were doctors, sued South Central Bell for failing to include their names in the Yellow Pages of its telephone directory. In support of their claim for lost profits, the plaintiffs offered two forms of evidence. First, they offered the testimony of a former patient who had searched for the name of one of the doctors in the Yellow Pages and who said that had he found the doctor's name, he would have used his services. Second, they offered the testimony of an expert who measured the lost profits by comparing two similar medical practices. In Super Valu Stores, the plaintiff brought a claim against the defendant in which he alleged that the defendant had entered into and breached a binding contract with him whereby he would operate a proposed grocery store. As evidence of lost profits, the plaintiff put on evidence of the defendant's own projections of profits, which projections had been produced in the normal course of business before the dispute arose. The plaintiff then offered the testimony of an expert witness who applied the figures in the projections to the term of the lease. In both Morgan and Super Valu Stores, this Court held that the evidence of lost profits was sufficient to satisfy the "reasonable certainty" standard.
In this case, the lease was for a term of 15 years, of which 4 were remaining. It also provided that the lessee had the opportunity to extend the lease for two 5-year terms. Alex Sexton, who operated the pizza business, testified that the business was not tremendously profitable, but that during the two and one-half months that A M operated the pizza business, gross sales were $30,000 to $40,000 per month, and that net profits may have been $2,000 to $3,000 per month. Dr. Verma testified that he believed gross sales totalled $30,000 to $40,000 per month and that he received a check for approximately $1,000, which represented five percent of the gross sales of the pizza business.
We hold that A M and the Sextons proved with reasonable certainty that they had lost profits. A jury could have found from the evidence that the pizza business would have earned a profit of at least $2,000 a month for the duration of the remaining term of the lease. The record indicates that the lease was executed on November 26, 1975, and that it was to commence on the date that a building was constructed on the property. The record does not indicate when the building was constructed. Kirkland purchased the property from the Sweeneys in July 1977 and, at that time, the building had been constructed. Assuming that the lease commenced in December 1975, A M had the right to operate a pizza business on the property until December 2000. As of June 3, 1986, the lease had been terminated. Thus, at the time the lease was terminated, the remaining term of the lease was 14 years and 6 months. Assuming that the pizza business earned a profit of $2,000 a month, lost profits for the remaining term of the lease would be $348,000, an amount substantially larger than that awarded to A M and the Sextons.
We note that in Super Valu Stores, supra, and in the cases cited therein, evidence of lost profits was supported by documentation and often by expert testimony. However, we feel that the evidence in this case meets the "reasonable certainty" standard. The "reasonable certainty" standard provides that "recovery will ensue despite the fact damages cannot be calculated with mathematical certainty or without difficulty where they are clearly proximately caused by the wrong."Morgan, supra, at *Page 1288 
116. We hold that the evidence offered by A M and the Sextons meets the "reasonable certainty" standard.
 V.
We have reviewed the remaining issues raised by Kirkland, and we find that they are without merit. Therefore, the judgment of the trial court is due to be, and it is hereby, affirmed.[6]
AFFIRMED.
JONES and SHORES, JJ., concur.
HORNSBY, C.J., and HOUSTON, J., concur in the result.
[1] A representative of Kirkland stated that the ad valorem taxes were those for the period from October 1, 1985, to the closing date, March 12, 1986. A representative of A M stated that he believed the payment was for ad valorem taxes to be incurred in 1986 after March 12. On the check was written "for pro rata ad valorem taxes[,] 1702 Quintard Avenue (rental property)."
[2] The assignment agreement required a payment of $1,150 "to serve as payment in advance for the last full month's rent under this agreement." A representative of Kirkland stated that the check was for the last full month's rent. A representative of A M stated that he thought the check was payment for a month's rent in advance. On the check was written "deposit for 1702 Quintard."
[3] The amount of the monthly rental to be paid by A M was less than the total monthly payment Kirkland was required to make to satisfy its debt to the bank.
[4] The clerk's record does not contain a copy of the pretrial order; however, the reporter's transcript contains a reference to the pretrial order. Kirkland set out part of the pretrial order in its brief, and A M and the Sextons refer to that part of Kirkland's brief as accurate.
[5] We note that Dr. Verma was a lay witness and that the witnesses in Deaton and Electrolux were expert witnesses. For the purpose of this opinion, however, we do not see that the distinction is relevant.
[6] We note that the jury returned a verdict for defendants Pierson and Griffin on their cross-claim against defendants A 
M and the Sextons and awarded them $2,000, even though the jury did not find in favor of Kirkland on its complaint. We do not mean to be understood as affirming that portion of the judgment based on that verdict. No issue regarding that portion of the judgment has been raised on this appeal.